DWORKEN & BERNSTEIN CO., L.P.A.
Patrick J. Perotti (OH #0005481)
James Timmerberg (OH #0067499)
60 South Park Place
Painesville, Ohio 44077
(440) 352-3391

JAVERBAUM WURGRAFT HICKS
KAHN WIKSTROM & SININS
Rubin Sinins (NJ #RS8325)
Gerald H. Baker
505 Morris Ave.
Springfield, NJ  07081
(973) 379-4200

BONEZZI SWITZER MURPHY
POLITO & HUPP CO LPA
Ronald A. Margolis, (OH #0031241)
1300 East 9th Street,  Suite 1950
Cleveland, OH  44114
(216) 875-2068

CROWLEY & CROWLEY
Noel C. Crowley (NJ #NC3712)
20 N. Park Place, Suite 206
Morristown, New Jersey 07960
(973) 829-0550

Attorneys for Objector, Lisa Margolis

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUSAN SABOL, et al.<br><br>    Plaintiffs,<br><br>       vs.<br><br><br>HYDROXATONE, LLC and<br>ATLANTIC COAST MEDIA<br>GROUP<br><br>    Defendants. | CIVIL ACTION NO:  2:11-cv-04586-KM-MAH<br><br>JUDGE KEVIN McNULTY<br><br><br>**LISA MARGOLIS' NOTICE OF INTENT TO OBJECT AND OBJECTION with Documents and Description of Exhibits and Testimony** |

*TABLE OF AUTHORITIES*

*Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 390 (C.D. Cal. 2007)....................14

*Boyko v. Am. Int'l Group, Inc.,* 2012 U.S. Dist. LEXIS 59125, at *57
    (D.N.J. Apr. 26, 2012) .......................................................................... 21

*Briggs v. Hartford Financial Services Group, Inc.,* No. 07-CV-5190,
    2009 U.S. Dist. LEXIS 66777 at *46 (E.D. Pa. July 31, 2009)..................6

*Class Plaintifffs v. City of Seattle,* 955 F.2d 1268, 1292-93 (9th Cir. 1992).........16

*Federal Trade Commission v. Willms,* Case No. 2:11-cv-828-MJP
    (W.D. Wash. February 22, 2012)...................................................... passim

*Fletcher v. Security Pacific National Bank,* 23 Cal.3d 442 (1979) .......................23

*Gammon v. GC Services Limited Partnership,* 162 F.R.D. 313, 321
    (N.D. Ill. 1995)...................................................................................22

*Girsh v. Jepson,* 521 F.2d 153, 160 (3d Cir. 1975) ..........................................2, 13

*In re American Family Enterprises,* 256 B.R. 377, 424 n.3 (D.N.J. 2000) ...........20

*In re CertainTeed Corp. Roofing Shingle Products Liability Litig.,*
    269 F.R.D. 468,  (E.D. Pa. 2010)..............................................................5

*In re Janney Montgomery Scott LLC Financial Consultant Litig.,*
    2009 U.S. Dist. LEXIS 60790, at *30 (E.D. Pa. July 16, 2009 ................15

*In re Lehman Bros. Securities and ERISA Litig.,* No. 09 MD 2017 (LAK),
    2012 U.S. Dist. LEXIS 90796, at *57  (S.D.N.Y. June 9, 2012).........17, 18

*In re Lloyd's American Trust Fund Litig.,* No. 96 Civ. 1262,
    2002 U.S. Dist. LEXIS 22663, at *33 (S.D.N.Y. Nov. 26, 2002) .............16

*In re Microsoft I-V Cases,* 135 Cal. App. 4th 706, 729 (2006) .......................22, 23

*In re Newbridge Networks Securities Litig.,* No. 94-1678-LFO,
    1998 U.S. Dist. LEXIS 23238, at *8 (D.D.C. Oct. 23, 1998)...................14

*In re Wafarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 257 (D. Del. 2002) .........13

*Joe D'Egidio Landscaping, Inc. v. Apicella,* 337 N.J. Super. 252
(N.J. App. 2001)...........................................................................22

*Karvaly v. eBay, Inc.,* 245 F.R.D. 71, 89 (E.D.N.Y. 2007) ...................................19

*Lettenmaeir v. Lube Connection, Inc.,* 162 N.J. 134, 139 (1999)..........................21

*Lane v. Facebook,* 696 F.3d 811, 831 (9th Cir. 2012)............................................2

*Lusby v. Gamestop Inc.,* No. C12-03783, 2013 U.S. Dist. LEXIS 41794
(N.D. Cal. Mar. 24, 2013) .........................................................27

*Securities and Exchange Commission v. Teo,* No. 2:04-cv-01815,
2011 U.S. Dist. LEXIS 103413, at *14 (D.N.J. Sept. 11, 2011) ..............22

*Sobel v. Hertz Corp.,* No. 3:06-CV-00545-LRH-RAM,
2011 U.S. Dist. LEXIS 68984, at *33 (D. Nev. June 27, 2011) ................7

*State v. Andrews,* 73 Md. App. 80, 89 (1987).......................................................22

*Synfuel Tecnologies, Inc. v. DHL Express (USA), Inc.,*  463 F.3d 646, 653
(7th Cir. 2006)............................................................................7

*TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 461(2d Cir. 1982)....17

*Wal-Mart Stores, Inc. v. Visa U.S.A, Inc.,*396 F.3d 96, 107 (2d Cir. 2005) ..........17


16 CFR 251.1(a)(2)...............................................................................................24

# TABLE OF CONTENTS

I.   Introduction…………………………………………………………………………………1

   A.  BACKGROUND FACTS…………………………………………………...………4

II.   The Released Claims Have a Potential Value of More than $300 Million…………6

A.   *Released Party Thomas Shipley Used His Background in Marketing*
  *to Implement a Deceptive Marketing Scheme that Generated Hundreds*
  *of Millions of Dollars in Sales*…………………………………………………...……7

B.   *Shipley Implemented His Scheme with the Help of His*
  *Accomplices*………………………………………………………...…..…10

C.   *The Bait-and-Switch Scheme Has Been Hugely Successful*
  *in Defrauding Consumers*…………………………………………….…....…11

III.   The Proposed Settlement Is Not Within the Range of Reasonableness
  in Light of the Best Possible Recovery………………………………….…..…13

IV.   The Proponents of the Settlement Have Presented No Evidence
  that the Defendants Would be Unable to Withstand a Greater Judgment………15

V.   The Settlement Improperly Releases Claims that Are Not Based
  on the Same Factual  Predicate…………………………………………….…...17

VI.   The Settlement Is Unfair to Consumers Who were Defrauded
  by Shipley's IVR Scheme Because It Gives Preferential Treatment
  to Class Members Who Requested a Refund……………………………………20

VII.   The Settlement Is Inadequate Because It Fails to Address the
  Essential Element of New Jersey's Consumer Fraud Act,
  which Is to Deter Deceptive Conduct……………………………………...……21

III.   The Prospective Relief Contained in the March 25, 2013 Amended
  Settlement Agreement Blesses the Deceptive IVR Scheme…………………….23

IX.   Margolis Has Filed a Class-Action Lawsuit Naming Shipley,
  ACMG, Marketing Architects and Hydroxatone LLC as Defendants……........25

X.   This Objection Is Filed by Class Member Lisa Margolis………………….......26

XI.   Conclusion…………………………………………………………………….26

**OBJECTOR LISA MAGOLIS' NOTICE OF INTENT TO OBJECT AND OBJECTION**

## I.      Introduction.

*Sabol* plaintiffs filed a putative class lawsuit against ACMG worth approximately $10 million dollars.  After limited discovery of one set of interrogatories and a request for production with no depositions, they propose to settle for approximately $1.75 million dollars cash payment[1] or "free product while supplies last." The settlement their counsel present to this court jointly with defense counsel, however, now tries to include and release $300 million dollars of other claims in the pending putative *Margolis* class against ACMG, Thomas Shipley, and Marketing Architects.  They propose releasing additional $300 million *Margolis* IVR claims with no additional consideration from ACMG or its insurance carrier, and with no payment of any kind from Shipley, Marketing Architects or their insurance policies.

The proposed *Sabol* Settlement Agreement releases the participants in a deceptive marketing scheme that generated over  $300 million dollars in illegal income. The settlement should be denied final approval as not being fair nor reasonable because: 1) it releases claims with a potential value in excess of $300 million, yet creates a common fund with a value of only $3 million; 2) the proponents of the settlement have submitted *no* evidence that the defendants are unable to withstand a greater judgment, or that it is reasonable to fully release Shipley and Marketing Architects when they are paying nothing in exchange for their release; 3) when they agreed to the settlement, Class Counsel admit they were unaware of  an additional $13 million dollar insurance coverage, and have obtained no payment from those policies; 4) the release is

---

[1] The total cash payment is $3 million. Amended Settlement Agreement, Doc 77-1, § 4.1(a)(i). One-third ($1 million) is for attorney fees for *Sabol* counsel*, Id.* at § 7.1. Approximately $250,000 is for the cost of class notice and administration, leaving $1.75 million for actual claims payments.  The totals for claims payments may be more or less, but Sabol's counsel and defense counsel refuse to provide that actual information to the undersigned.

overbroad because it releases claims based on a separate factual predicate, and which are currently pending against the released parties in *Margolis v. Atlantic Coast Media Group,* No. 2:11-cv-04355 (D.N.J.), without providing any further compensation for those claims; 5) the settlement improperly gives preferential treatment to a small group of class members by making a cash award only to the *Sabol* "refund" class members and no cash payment to the *Margolis* "IVR" class members; 6) the settlement fails one of the essential purposes of the Consumer Fraud Act under which the claims were brought—it does not deter the deceptive conduct.

The settlement permits the released parties to continue a marketing scheme involving deceptive practices that were specifically prohibited by the Stipulated Final Judgment and Order in *Federal Trade Commission v. Willms,* Case No. 2:11-cv-828-MJP (W.D. Wash. February 22, 2012), Doc 106.[2]

Heightened scrutiny is applied to pre-certification settlement proposals, because "[c]ollusion is far more likely before certification, and exponentially higher if the class is expanded as part of the settlement." *Lane v. Facebook,* 696 F.3d 811, 831 (9th Cir. 2012).  A showing of reasonableness for ***all*** proposed terms and released parties is required. The showing may not be made by argument of counsel alone, because even settlement approval has evidential requirements. *Girsh v. Jepson,* 521 F.2d 153, 160 (3d Cir. 1975). Objector provides this Court with expert affidavits on these issues, while Proponents' moving papers offer no such evidence.

The proposed *Sabol* settlement cannot survive heightened scrutiny. First, the Proponents ask this court to settle a separate set of claims for fraud and breach of contract worth $300 million arising from the defendants' practice of using a deceptive script for their computerized interactive-voice-response ordering system ("IVR"). Specifically, the computer collects payment

---

[2] Exhibit 24.

2

information based on an offer of $7.95 for product, but that offer is a sham and does not exist. Expert Susan Kleimann has reviewed the *Sabol* defendants' IVR script and confirmed this.[3] Kleimann is the expert used by the FTC to show that a "free/risk free" offer program was deceptive in *FTC v. Willms,* Case No. 2:11-cv-828-MJP (W.D. Wash.).  That suit, identical to this matter, involved a deceptive scheme using "risk-free" offers to lure consumers into payment of more than shipping and handling and auto-shipment programs.[4]

    Second, the Proponents have failed to establish that ACMG is unable to withstand a greater judgment with respect to the $300 million in claims they are attempting to include. Class Counsel stated that if confirmatory discovery did not bear out ACMG's claim of poor financial condition, "there will be no settlement."[5] But the only financial analysis (Ex. 2) before the court on this issue is from Robert Greenwald, a certified public accountant, certified fraud examiner, and an accredited business appraiser.  He has testified as an expert in more than 200 cases.  He states, without contradiction by Proponents, that the financial data produced by the *Sabol* defendants is "inadequate to accept a claim of insolvency."[6] Greenwald has identified multiple categories of additional documents that would have to be provided (which the defense had refused to provide to Objectors or Class Counsel) in order to make such a claim.[7]

    Third, Class Counsel carelessly overlooked an additional $13 million in insurance coverage available to satisfy the class members' claims. John O'Brien JD, CLU, CPCU, serves on the boards of five insurance companies and has served as an expert and consultant on the regulation and compliance of commercial lines as to policy language, policy services, and

---

[3] Declaration of Susan Kleimannn, attached as Ex. 3.
[4] Declaration of Susan Kleimann, page 8.
[5] August 17, 2012 e-mail from Andrew Friedman to Patrick Perotti, Ex. 20.
[6] Robert Greenwald declaration, attached as Ex. 2.
[7] Robert Greenwald declaration.

claims.  He confirmed that three insurance policies, which Class Counsel admits not knowing-of when he settled the case, provide coverage to Shipley and Marketing Architects for the released claims.  See, Exhibit 1.

## A.  BACKGROUND FACTS.

Certain facts are not disputed, and they make approval improper. The $3 million dollar fund and full release extinguishes more than $300 million dollars of claims. No evidence is offered that further payment from the Releasees, including ALL their insurance, is unavailable. The only evidence before the court is from Objectors and it identifies additional, unused insurance coverage in excess of $5 million additional dollars which applies to the claims, which Counsel for the class admitted he did not know existed when he negotiated the settlement.

The evidence demonstrates that the release added Thomas Shipley and Marketing Architects without obtaining any payment from them.  The evidence demonstrates Shipley and Marketing Architects have more than $5 million dollars in insurance coverage for the released claims, which was left on the table in what can be viewed as haste by Class Counsel to cut a quick deal paying a $1 million dollar attorney fee.

Next, Class Counsel acceded to Defendants' demand to add Thomas Shipley and Marketing Architects to the full release, but required no payment from them and offers this court NO evidence of inability of Shipley and Marketing Architects to contribute to the Settlement. Shipley and Marketing Architects are highly solvent and no permitted reason exists to fully release them from $300 million dollars in claims without paying a dime.

The evidence from the expert forensic financial analyst demonstrates that the incomplete 'financials' provided by defense counsel to "prove" ACMG and Hydroxatone inability to

contribute anything do not do so.  Class Counsel never had any expert in corporate finance examine the materials to verify the claim of inability to pay.  The only financial analysis provided to the court, which is uncontested, demonstrates that the sparse items from defense counsel do not show that ACMG and Hydroxatone are unable to pay toward this settlement.

The objectors have no burden to disprove the fairness and reasonableness of the settlement. Rather, the Proponents have the burden of proving that the settlement is fair and reasonable. *In re CertainTeed Corp. Roofing Shingle Products Liability Litig.,* 269 F.R.D. 468, (E.D. Pa. 2010) (the "burden of establishing fairness, reasonableness, and adequacy lies on the proponents of the settlement").

The Proponents offer nothing to address these issues.  Statements of counsel in briefs and at hearing do not meet the burden which requires affidavits and evidence of a competent nature.

Reviewing the history of this litigation provides a very clear understanding why this Settlement went totally awry.

The *Sabol* lawsuit addressed a pool of discrete claimants and claims (the refund claims). The value of the refund claimants comprises approximately $10 million dollars. The *Margolis* lawsuit addressed a different group of claimants and claims, the IVR claims. The IVR claims have a total value in excess of $300 million dollars.

Counsel for Margolis and Sabol agree that the *Sabol* and *Margolis* suits are based on different factual predicates: "the claims asserting in the [*Sabol*] case were different from the *Margolis* claims." Sabol's Memorandum Opposing Consolidation of Margolis and Sabol Lawsuits, Doc. 63, PageID 517 (Exhibit 29).

It is also not disputed that counsel for Sabol did not sue Marketing Architects or Thomas Shipley and they are not parties in the *Sabol* litigation.

Class Counsel negotiated a settlement of $3 million dollars against ACMG. That amount reasonably covers the refund claims.

The Settlement ultimately presented to the court, however, was not limited to the *Sabol* refund claims and claimants. It purports to cover all customers for claims based on any factual predicate, and it includes not just ACMG but also Shipley and Marketing Architects.

This approach expanded the value of claims being released from less than $10 million dollars, to over $300 million dollars, without adding anything to the settlement pool. The proposal grants releases to persons and entities not sued in this case, without requiring anything from them, despite them being able to contribute substantially in exchange for the release they are obtaining. The proposal makes no attempt to determine insurance coverage available to pay the class members millions of dollars additional. The proposal tilts payments so the *Sabol* customers receive cash, while the IVR customers are not permitted to receive any cash. The proposal achieves no deterrence since ACMG, Shipley and Marketing Architects disgorge none of the millions they obtained through the challenged conduct. The proposal allows them to continue "unfair or deceptive acts or practices in or affecting commerce" that are prohibited by the Federal Trade Commission under 15 U.S.C. § 45(a)(1).

## II. The Released Claims Have a Potential Value of More than $300 Million.

A necessary element for approval of a pre-certification settlement proposal is evidence of the value of the claims being released. *Briggs v. Hartford Financial Services Group, Inc.,* No. 07-CV-5190, 2009 U.S. Dist. LEXIS 66777 at *46 (E.D. Pa. July 31, 2009) (to "evaluate the

settlement against the best possible recovery, it is essential to grasp how many valid claimants may reasonably be predicted to exist, and the probable value of their claims"); *Synfuel Tecnologies, Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006) ("the court should ... 'insist[] that the parties present evidence that would enable []possible outcomes to be estimated,' so that the court can at least come up with a 'ballpark valuation'").

In their memorandum in support of their motion for final approval, the *Sabol* plaintiffs do not address, at all, the potential value of the claims that would be released by the settlement. Absent that information, approval should not be granted. *Sobel v. Hertz Corp.,* No. 3:06-CV-00545-LRH-RAM, 2011 U.S. Dist. LEXIS 68984, at *33 (D. Nev. June 27, 2011) (the failure to provide evidence of the "value of the claims to be surrendered" is "alone grounds for denying final approval, as the court is simply unable to fulfill its duty to the settlement class"). It seems clear why Proponents omitted any discussion of this in their moving papers.  Discovery in the *Margolis* matter (not taken in *Sabol*) demonstrated that the value of those claims exceed $300 million.

*A.  Released Party Thomas Shipley Used His Background in Marketing to Implement a Deceptive Marketing Scheme that Generated Hundreds of Millions of Dollars in Sales.*

In 2005, Thomas Shipley came up with a business plan based on his background in marketing.[8] His plan was to trick consumers into disclosing their credit or debit card information, without first disclosing the cost of the product for which they were billed. The hook was an ad

---

[8] From 1995 to 1999, Shipley devoted his time to Operations Management Group a firm that provided marketing consulting services. Shipley depo 18:1-15 (Ex.21). From 1998 through 2002, he operated Executive Shop, LLC, a multi-channel catalog business that sold briefcases, desk sets, and pens. Shipley depo 26:13-27:8.  In 2002, he returned to running Operations Management Group full time, and continued to do so through 2005. Shipley depo 27:11-15. In 2005, he started the Atlantic Coast Media Group with Andrew Surwilo. Shipley depo 35:1-4.

for a phony, never available "risk-free" offer.[9] When a consumer called in response to that ad, he was placed into an automated system (an interactive-voice-response or "IVR").[10] The system did not permit the consumer to ask questions, and there was no option to speak to a live operator. Instead, the consumer had to respond to prompts from a computer.

Discovery in *Margolis* revealed that consumers were calling the number uniformly in response to ads which offered defendant's product free of charge for only shipping and handling. But that is not what the IVR gave them.  It charged them a minimum of $69.95.  The IVR repeated the fraud from the original TV/radio ad.  After repeating that the customer would receive the product for only $7.95 shipping and handling, that is all you pay, [11] (which was a lie) the computer asked the consumer to accept the deal by giving his credit/debit card information.[12] At the time that the consumer provided his credit card number, the $7.95 shipping and processing charge was the only price information provided to him.[13]  AFTER taking the credit card number, the system routed the customer through extended other offers, requirements, terms and conditions, with the customer ending up with at least a $69.95 charge on their credit card for a product falsely represented as costing only $7.95, that is all you pay.

This exact practice was enjoined as a violation of federal law in *FTC v. Willms,* Case No. 2:11-cv-00828-MJP (W.D. Wash. February 22, 2012). The *Willms* court ordered that the

---

[9] Siegel depo 206:8-207:7 (court reporter's transcription of a Hydroxatone radio ad offering a free trial, and the chance to try Hydroxatone risk free).

[10] Shipley depo 65:9-12 (the IVR is "an automated way to take a customer order"); ACMG-000000076-83 (Ex. 23); Siegel depo 63:7-11 ("It's a computer that provides audio information on a recorded basis. So it records people's voices, and then you can respond to the computer through the phone pad or through speech to have a back and forth dialogue with the computer.")

[11] ACMG-0077, ¶ 9:  "To receive your risk-free trial of Hydrolyze, AND claim your free mystery gift, all we ask you to take care of today is the small shipping and processing fee of 7.95."  (Ex.23)

[12] ACMG-0078, ¶ 10:  "Great!  We will not select one of our payment options to cover the small shipping and processing charge."

[13] ACMG-00000076-83 (Ex. 23).

defendant was "permanently restrained and enjoined" from "[f]ailing to clearly and conspicuously disclose ... before consumers are asked to ... reveal billing or bank account information ... [t]he total cost to purchase, receive, or use any product or service that is the subject of the sales offer[.]"[14]

The same way in the instant case, the $7.95 offer didn't exist. Once the IVR had obtained the consumer's payment information, the consumer was presented with a litany of terms and conditions, some of which involved multiple payments totaling in excess of $100.[15] None of them involved receiving a product for the cost of shipping and processing. The consumer was then sent multiple containers of product with expensive billings every month, or sent product not ordered.   The most typical scam was to send the consumer[16]  product with $139.90 (two payments of $69.95) taken from their credit card (the number which defendants obtained though their fraud).[17] The $139.90 "deal" was plainly not the same as the original $7.95 offer that enticed the consumer to provide his credit card number. Nor was that $139.90 package ever mentioned in the original ad, or by the IVR computer before the consumer provided his payment information.

In discovery the defense admitted that they could not identify a single customer who received a container of product for $7.95 shipping and handling.[18]   Rather, this discovery revealed that over $300 million dollars was collected from consumers by charges to their credit cards which were fraudulent and prohibited by law.

---

[14]*FTC v. Willms,* Case No. 2:11-cv-00828-MJP, Doc 106 (W.D. Wash. Feb. 22, 2012) (attached as Ex. 24).

[15] ACMG-0078, ¶ 11:  offering two jars of Hydrolyze for two payments of $69.95 (or $139.90), with recurring charges of $139.90 every two months for an indefinite period of time.

[16] ACMG-0081, ¶ 18.

[17] ACMG 0081, ¶ 18:  If the consumer declined to cancel his order

[18] Shipley depo 165:13-166:1.

*B.  Shipley Implemented His Scheme with the Help of His Accomplices.*

In 2005, Shipley joined with Andrew Surwilo to set up Atlantic Coast Media Group ("ACMG").[19] According to Shipley, the purpose of the company was to "market [health and beauty] products through a multi-channel approach which means TV, radio, direct mail, print advertising and home shopping channel[.]"[20] Shipley is the co-CEO of ACMG and responsible for all of its marketing.[21]

To work jointly on this marketing and collecting the credit card information, Atlantic Coast Media Group contracted with Marketing Architects, to jointly operate the IVR system, as well as produce the television and radio commercials.[22] "Marketing Architects, Inc." appears on every page of every IVR script. By preparing scripts for and operating the IVR system, Marketing Architects directly participated in a critical role in the implementation of Shipley's fraudulent scheme. *C. The IVR Scheme Is Deceptive.*

The IVR system used by defendant is deceptive. Plaintiff and the customers in the *Margolis* litigation have a strong ability to prevail on those claims.  See, *Willms*, Case No. 2:11-cv-00828-MJP (E.D. Wash. Feb. 22, 2012), Doc 106, page 10 (enjoining Willms from misrepresenting that "a product or service is offered on a "free,' 'trial,' or 'bonus' basis, or words of similar import, denoting or implying the absence of any obligation on the part of the

---

[19] Shipley depo 35:2-4.

[20] Shipley depo 112:8-17.

[21] Shipley depo 92:19-21; 131:14-15 (the "different departments that report to me are IT, finance and accounting and marketing"); Siegel depo 71:3-5 (Shipley was running the marketing department at Atlantic Coast Media Group).

[22] Shipley depo 63:19-64:25 (Marketing Architects does "TV creative promotionals and radio creative promotionals"); Siegel depo 236:2-237:3 ("Marketing Architects handled, you know, all of the IVR calls").

recipient to pay anything other than a nominal fee"). Marketing expert Susan Kleimann, an expert retained by the federal government on the identical issues, has reviewed the IVR script and likewise found it to be deceptive: it fails "to offer any consumer the initial deal, using all of the techniques above to elide the consumer into a position of taking more than the original offer. The net impression of this script is intent to mislead consumers so that they do not know the deal and are caught by tricks and traps."[23] She noted that the Hydrolyze IVR script uses consumer appeals and language techniques that are intended to draw consumers' attention to the advantages of the transaction while simultaneously overwhelming them with the 'bits' or details of the actual deal, resulting in little or no retention of the terms and conditions of the agreement. She easily concludes that "*that the IVR script intends to mislead.*" (Emphasis added.)[24]

C.   *The Bait-and-Switch Scheme Has Been Hugely Successful in Defrauding Consumers.*

Using bait-and-switch tactics to sell ACMG's products through Marketing Architect's IVR system, Shipley and his accomplices have generated *hundreds of millions* of dollars in income during the class period as reflected in the following chart:

| Year | Total Net Sales[25] | Percentage of sales by IVR | Value of IVR sales (net sales multiplied by percentage of sales by IVR)[26] |
|------|---------------------|----------------------------|------------------------------------------------------------------------------|
| 2007 | $35,515,902 | 11% | $3,906,749.22 |

---

[23] Declaration of Susan Kleimann, p. 22, ¶ 46 (Ex.3).

[24] *Id.* at p. 20, ¶ 41.

[25] The information in this chart is based on data contained in Ex. 25, which consists of a July 31, 2012 e-mail from ACMG's counsel and attachments.

[26] The  value of IVR sales was calculated  based on the information provided by ACMG in the July 31, 2012 e-mail. Counsel for ACMG has refused to provide further and more detailed information or financials.

| 2008 | $56,386,967 | 14.71% | $8,294,522.84 |
|---|---|---|---|
| 2009 | $104,689,221 | 48.73% | $51,015,057.40 |
| 2010 | $170,544,596 | 66.93% | $114,145,498.00 |
| 2011 | $203,494,330. | 50.82% | $103,415,819.00 |
| 2012, January through May | $40,644,402 | ? | ? |
| 2012, June through December | ? | ? | ? |
| 2013 | ? | ? | ? |

The data provided by ACMG was woefully incomplete since they refused to provide other key financial information.  But the information which the undersigned was able to obtain, as set forth above, shows at minimum the IVR income during the relevant time period exceeded $300 million (using a *very* conservative assumption that there were approximately $25 million of IVR income in 2012 and 2013). All of this income was generated using the same deceptive practice of collecting payment information based on a non-existent 'offer of product in exchange for a small shipping and processing fee.' In 2010, the bait-and-switch IVR was responsible for almost 70% of ACMG's income. This deceptive practice of using a fictitious $7.95 offer to get payment information from consumers was not the result of a rogue employee breaking the rules; it was ACMG's way of doing business.

**III.     The Proposed Settlement Is <u>Not</u> Within the Range of Reasonableness in Light of the Best Possible Recovery.**

In the Third Circuit, the fairness, reasonableness, and adequacy of a class-action settlement are determined by the nine-factor test set forth in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975). The eighth and ninth *Girsh* factors consider the reasonableness of the settlement in light of the best possible recovery and the risks the parties would face at trial. *In re Wafarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 257 (D. Del. 2002). In cases seeking monetary relief, the present value of total damages must be compared with the amount of the proposed settlement, after being discounted for the risk of not prevailing. *Id.*

Oddly, neither Class Counsel nor defense counsel as Proponents of this Settlement have provided anything to this court on the present value of the total damages.  Objector respectfully submits this was not oversight.

Regardless, the information is provided to the court now. See above table.  Here, the best possible recovery would be approximately $300 million based on the value of the IVR claims. This figure is uncontested, with the *Sabol* plaintiffs and defense counsel declining to provide any other estimate of the best possible recovery in their memorandum in support of final approval. In comparison, the total cash value of the proposed settlement is *less* than $3 million, since that pool is also committed to payment of costs and attorney fees (which are 'agreed' between Class Counsel and defendant to be $1 million dollars).  Even factoring in the offered "while supplies last" product dollar for dollar (which courts do not do, as discussed below), the value is $7 million.   That means Class Counsel has discounted the best possible recovery of $300 million dollars by at least 98.5%.

13

While courts have "not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable", a settlement that "secures roughly six to twelve percent of a *potential* trial recovery ... seems to be within the targeted range of reasonableness." (Emphasis *sic*.) *In re Newbridge Networks Securities Litig.,* No. 94-1678-LFO,1998 U.S. Dist. LEXIS 23238, at *8 (D.D.C. Oct. 23, 1998). The instant settlement here of $1.75 million cash payment or "while supplies last" product for a claim worth $300 million does not fall within the "targeted range."

The product part of the offer is odd.  It is only available "while supplies last."[27] Also Defendants are PAID (from the money in the settlement pool supposedly available for cash payments) $7.95 in shipping and processing for every 'free' jar sent.  That sounds awfully like the conduct for which this suit was filed in the first place.[28] "[C]ourts widely recognize that 'compensation in kind is worth less that cash of the same nominal value.'" *Acosta v. Trans Union, LLC,* 243 F.R.D. 377, 390 (C.D. Cal. 2007). Class members will have little use for additional product from the defendants; the defendants products have little value in the secondary market; and, the cost to the defendants of providing the product is negligible, particularly with shipping and processing costs be charged to the common fund. *Acosta,* 243 F.R.D. at 390.

---

[27] Doc 77-1, Amended Settlement Agreement, Page ID 817, §5.4(b).
[28] Doc 77-1, Amended Settlement Agreement, Page ID 819, § 5.5(h).

**IV.     The Proponents of the Settlement Have Presented No Evidence that the Defendants Would be Unable to Withstand a Greater Judgment.**

Another key factor in obtaining settlement approval is for the proponents to establish that the released parties cannot withstand a larger payment.   Again, Class Counsel and defense counsel offer nothing probative on this issue.   Class counsel accepted at face value the paper claim of 'poor financial condition' without offering any analysis from a financial consultant or accountant on the defense numbers.

The *Sabol* plaintiffs admit that proof of the defendants' inability to withstand judgment "weighs heavily in favor of approval of the settlement."[29] Where is that evidence? The *Sabol* plaintiffs say that "various financial statements" were produced "as part of confirmatory discovery[.]"[30] But they do not explain how those documents establish that the defendants are unable to withstand a greater judgment. In the absence of any evidence of an inability to withstand a greater judgment, this purported factor cannot weigh in favor of the proposed settlement. *In re Janney Montgomery Scott LLC Financial Consultant Litig.,* No. 06-3202, 2009 U.S. Dist. LEXIS 60790, at *30 (E.D. Pa. July 16, 2009) ("[g]iven the lack of evidence presented to the Court regarding Defendant's ability to pay, the Court concludes that this factor is neutral").

Just the opposite, Robert Greenwald, a respected forensic accountant used regularly by the Federal Court in business financial evaluation, solvency, and similar matters, has reviewed the materials.[31]     He confirms, in the attached declaration, that insufficient financial

---

[29] Doc 92, Memo in Support of Plaintiffs' Motion for Final Approval, PageID 1107.
[30] Doc 92, Memo in Support of Plaintiffs' Motion for Final Approval, PageID 1107.
[31] Greenwald Declaration, attached as Ex. 2.

15

documentation was produced in the *Sabol* litigation for anyone to conclude that the defendants would be unable to withstand a greater judgment.[32]

Along the same lines, the Proponents slipped Shipley and Marketing Architects into the release and appear to think they can sneak them past any of this analysis.  That would be wrong.  The *Sabol* plaintiffs completely omit any discussion in their moving papers of the ability of the released non-parties (Shipley and Marketing Architects) to contribute to the settlement.

Courts "recognize that it is appropriate for a class action settlement to include a *limited* release of a non-party ..., where that non-party has contributed *substantially* to making the settlement possible." (Emphasis added.) *In re Lloyd's American Trust Fund Litig.,* No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663, at *33 (S.D.N.Y. Nov. 26, 2002).

The release here is a FULL release, and they have contributed nothing.

Approval of a release of non parties requires the court to separately consider the "fairness, adequacy, and reasonableness of the [released non-party's] contribution." *Class Plaintifffs v. City of Seattle,* 955 F.2d 1268, 1292-93 (9th Cir. 1992). Here, the released parties have contributed nothing to the settlement, in spite of the fact that they are financially solvent[33] and have up to $13 million of additional insurance coverage. Put bluntly, the terms of the release which Proponents ask this court to approve, giving them a free ride, are clearly unfair, inadequate, and unreasonable.

---

[32] *Id.*

[33]  The Proponents may complain that Objector has provided no hard financial information to prove that Shipley and Marketing Architects are financially solvent.  First, Objector HAS provided a $5 million dollar insurance policy which is not being accessed. Second, Objector has specifically asked for financial information from Shipley and Marketing Architects but the defense has refused to provide it.  Objector respectfully submits that the Proponents are the ones who added Shipley and Marketing Architects to the full release without requiring them to pay a dime, and it is Proponents who bear the burden under law to show those Releasees cannot afford to make any contribution.

16

**V.      The Settlement Improperly Releases Claims that Are Not Based on the Same**

**Factual  Predicate.**

Class action settlements may release claims not presented directly in the action only when they are based "'on the identical factual predicate as that underlying the claims in the settled class action.'" *In re Lehman Bros. Securities and ERISA Litig.,* No. 09 MD 2017 (LAK), 2012 U.S. Dist. LEXIS 90796, at *57  (S.D.N.Y. June 9, 2012); *Wal-Mart Stores, Inc. v. Visa U.S.A, Inc.,*396 F.3d 96, 107 (2d Cir. 2005). "[S]pecial care must be taken [by the court] to ensure that the release of a claim not asserted within a class action or not shared alike by all class members does not represent 'an advantage to the class ... by the uncompensated sacrifice of claims of members[.]'" *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 461(2d Cir. 1982).

Here, the *Sabol* litigation and then settlement went from originally limited, to now extraordinarily broad, with the term released claims morphing from refund claims, then to refund and limited continuity claims, now to include "any and all actions ... that in any way challenge Defendants' Risk Free Trials and/or Auto-Shipment Programs, billing practices ..., the representations and/or disclosures and/or Defendants' adherence to the terms ... of such offers, and/or any claim related to the receipt of and/or payment for unordered products."[34]The Second Amended Complaint did not assert such claims.  It was limited for the *Sabol* class to person who "(1) returned the product ... but were denied a refund and/or were sent subsequent shipments of unordered products, and/or (2) requested to cancel their membership in the [Auto-Ship Program] but incurred additional charges for subsequent shipments of unordered products[.]"[35]

---

[34] Doc 77-1, Amended Settlement Agreement, PageID 835, § 14.2.
[35] Doc 65, Second Amended Complaint, PageID 463, ¶ 1.

17

The factual predicate of the *Sabol* claims was that the defendants didn't honor their refund and cancellation policies. Even now, the *Sabol* plaintiffs continue to identify the common questions of fact in their case as: "whether Defendants consistently prevented Class Members from receiving refunds from the return of 'risk-free' products; [and] whether Defendants prevented the timely cancellation of auto-ship products[.]"[36] They also note that "were this case to proceed, the primary issue would be whether Defendants were liable to the Class under the claims pled in the Complaint based on the allegations that they allegedly systematically refused Class Members' requests for refunds and/or requests to cancel the auto-ship program."[37]

The IVR claims asserted by Margolis, with a different factual predicate than the *Sabol* refund claims, are valued by Defendants' own records at more than $300 million dollars for a reason.  They require the proof of different facts, based not on any request for refunds or cancellations, but rather on IVR marketing which took credit card information and was illegal up front.  Courts "will decline to uphold releases where the claim purportedly released required 'proof of further facts.'" *In re Lehman Bros.,* 2012 U.S. Dist. LEXIS 90796 at *59, quoting *TBK Partners,* 675 F.2d at 462. Further facts that would have to be proved in the Margolis claim that are not necessary to prove the *Sabol* plaintiffs' refund claim:

- The plaintiff was placed into the IVR system (none of the named plaintiffs in *Sabol* have alleged that fact);

- The IVR offers product in exchange for the cost of shipping and processing;

- The offer of product for the cost of shipping and processing was not actually available;

---

[36] Doc 92, Memo in Support of Plaintiffs' Motion for Final Approval, Page ID 1091.
[37] Doc 92, Memo in Support of Plaintiffs' Motion for Final Approval, PageID 1094.

- The offer of product for the cost of shipping and processing was a bait-and-switch used to obtain the plaintiff's payment information;

- The IVR scripts are deceptive;

- Marketing Architects operated the IVR system; and

- Thomas Shipley knew and approved of the deceptive IVR scripts.

The Second Amended Complaint in *Sabol* does not mention the IVR, Thomas Shipley, or Marketing Architects. It is predicated on the consumer requesting a refund, which is not an element of Margolis' IVR claim.   The outcome of the settlement proposal gives preferential treatment to *Sabol* class members, structuring a deal to put cash in the pockets of a small number of class members while providing no cash option for the majority of the released claimants is unlawful.

To reiterate, the Settlement took Sabol claims which possibly could stand a $3 million dollar pool, and broadened them beyond recognition to matters never pled or prosecuted in *Sabol*, in order to obtain Defendants' agreement to settle and pay cash to *Sabol* claimants only. Where, as here, "the class representatives seek to advance their own interests by sacrificing the rights of the majority of Class Members, who stand to gain nothing of substantial value from the proposed settlement, for the benefit of the small group of Eligible Class Members", the concern arises that class representative would seek a better settlement themselves by throwing the claims of other class members to the wind. *Karvaly v. eBay, Inc.,* 245 F.R.D. 71, 89 (E.D.N.Y. 2007).

In *Karvaly,* the district court denied preliminary approval of a class settlement because the class representative sought to "bargain away the rights of other Class Members <u>to assert legal claims unreleased to the present action</u> ... for the sake of the Eligible Class Members' own

pecuniary interests." *Id.* at 90.   Rejecting the Sabol settlement is similarly appropriate here. The *Sabol* plaintiffs have asserted a narrow refund claim, but to get Defendant to settle that claim, they are attempting to release all possible claims against the defendants with respect to the sale of any of their beauty products, including Margolis' claims, which rely on a different factual predicate.

## VI.   The Settlement Is Unfair to Consumers Who were Defrauded by Shipley's IVR Scheme Because It Gives Preferential Treatment to Class Members Who Requested a Refund.

"It is axiomatic that all class members possessing similar claims be treated equally, and that preferential treatment ... is impermissible." *In re American Family Enterprises,* 256 B.R. 377, 424 n.3 (D.N.J. 2000). Here, the *Sabol* refund class, called Group One Claimants, who were victims and spent more than $200 are entitled to recover $100 in cash. But Group Two Claimants who were victims and spent the same amount of money are not entitled to any cash recovery.

How is that fair?

Neither the settlement agreement nor the motion for final approval explains why consumers who were victims and suffered damages should receive different recoveries. The settlement class it purports to include all persons who "were charged for Hydroxatone-branded products."[38] And the settlement purports to release "any and all actions, causes of action, claims demands [etc.] of any nature and description whatsoever[.]"[39] If that's the case, why is there a Group One refund class that is receiving cash payments, while everyone else is lumped into Group Two and receive no cash and instead *might* receive some product *if* supplies last?

---

[38] Doc 77-1, Settlement Agreement, PageID 811, § 3.1.
[39] Doc 77-1, Settlement Agreement, PageID 833, § 14.2.

Not only is this contrary to Rule 23, it resulted in a defective notice to the class members in Group Two.  Those persons are entitled to cash the same as the others, but were told that they could not receive any cash if they submitted a claim.  Claims submission rates in cases like this one are notoriously low to begin with where the customer must deal with a long claim form rather than simply receiving a check. The submission rate for product is not even a fraction of that, since product is just not worth the effort.  A dramatically higher submission rate would have occurred for Group Two members if they were properly provided a cash payment. Your Objector was prepared to provide expert submission on this point, but was prevented from doing so by Class Counsel and Defendants' counsel instructing the Settlement Administrator not to provide the records on the Settlement and Claims processing, when that information was needed by the Class Notice expert to provide an affidavit on these matters.

**VII.    The Settlement Is Inadequate Because It Fails to Address the Essential Element of New Jersey's Consumer Fraud Act, which Is to Deter Deceptive Conduct.**

A proposal for class settlement is also examined for whether it promotes or hinders the objective of the underlying claims asserted. This proposal accomplishes none of those goals, and rather frustrates them, since:  Defendants are not disgorging a penny from the hundreds of millions they collected using a system like the one enjoined by the FTC in *Willms*; and Defendants are permitted by the Settlement Agreement proposed here to continue the conduct which was challenged and barred by the FTC in *Willms*.

The *Sabol* plaintiffs have asserted a claim under the New Jersey Consumer Fraud Act. Doc 65, Second Am. Comp., ¶¶ 44-56. The purpose of the Consumer Fraud Act is to "deter fraudulent practices by merchants in the marketplace." *Boyko v. Am. Int'l Group, Inc.,* 2012 U.S.

21

Dist. LEXIS 59125, at *57 (D.N.J. Apr. 26, 2012); *Lettenmaeir v. Lube Connection, Inc.,* 162 N.J. 134, 139 (1999) (the Act was designed to serve both "deterrent and protective purposes"); *Joe D'Egidio Landscaping, Inc. v. Apicella,* 337 N.J. Super. 252 (N.J. App. 2001) (the Act "is remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection").

In cases like the present one, the use of a Rule 23 Class action is intended to deter illegal conduct: "Class actions were designed 'not only to compensate victimized members of groups who are similarly situated ... but also to deter violations of the law .... Disgorgement of illegal gains from wrongdoers ... would fulfill the deterrence objectives of class actions.'" *Gammon v. GC Services Limited Partership,* 162 F.R.D. 313, 321 (N.D. Ill. 1995), quoting H. NEWBERG, Class Actions § 4.36; *In re Microsoft I-V Cases,* 135 Cal. App. 4th 706, 729 (2006) (establishing a minimum liability of $733 million for a class action settlement showed "significant usefulness in effectuating the deterrent and disgorgement purposes of the cause of action").

Courts have routinely recognized that to achieve deterrence there must be some disgorgement of ill-gotten gains. *Securities and Exchange Commission v. Teo,* No. 2:04-cv-01815, 2011 U.S. Dist. LEXIS 103413, at *14 (D.N.J. Sept. 11, 2011) (the "purpose of the equitable remedy of disgorgement is 'to deprive a wrongdoer of his unjust enrichment and to deter others"). In a deceptive trade practices case, a Maryland court observed that "'[to] permit the [retention of] even a portion of the illicit profits would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved.'" *State v. Andrews,* 73 Md. App. 80, 89 (1987).

In *Fletcher v. Security Pacific National Bank,* 23 Cal.3d 442 (1979), which involved a consumer class action claim against a bank, the Supreme Court of California explained that "inasmuch as '[protection]of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society' ..., we must effectuate the full deterrent force of the unfair trade statute." *Id.* at 451. The *Fletcher* court noted that to "'permit the [retention of even] a portion of the illicit profits, would impair the full deterrent force that is essential if adequate enforcement [of the law] is to be achieved.'" *Id.,* quoting *Securities & Exchange Com'n v. Golconda Mining Co.,* 327 F. Supp. 257, 259-60 (S.D.N.Y. 1971).

Here, the entire settlement fund is being paid by insurance.  Defendants are not disgorging a penny.  It is expected Defendants will argue they need not disgorge since this is a "settlement" and they "admit no liability."  That reasoning is false.

In *In re Microsoft I-V Cases,* 135 Cal. App. 4th at 728, the settlement agreement included a provision of "nonadmission" stating that Microsoft did not admit the truth of any of the allegations, and that the settlement did not reflect any wrongdoing. The appellate court nevertheless found that approval of the proposed settlement was proper for it served an implied deterrent or disgorgement purpose. *Id.*

## VIII.   The Prospective Relief Contained in the March 25, 2013 Amended Settlement Agreement Blesses the Deceptive IVR Scheme.

The amended settlement agreement filed on March 25, 2013, includes the following prospective orders which Proponents ask this court to approve:

(1) "Defendants will not use the word 'free' *by itself* for offers where the customer is

required to return the product[.]" (Emphasis added.)[40] This would not even slightly impair the IVR scheme.

The defendants could continue to use the terms "risk-free" or "free-trial," which are equally deceptive. As the FTC has explained the representative language used in "free" offers includes: "2-for-1Sale", "50% off with purchase of Two", "1[cent sign]Sale", etc. 16 CFR 251.1(a)(2), the FTC's "Guide Concerning the Use of the Word 'Free' and Similar Representations." Simply put, the IVR scripts used by Shipley and his accomplices would be no less deceptive if they collected payment information on the basis of an offer of product in exchange for 2 cents plus shipping and processing.

(2) "Defendants will disclose the terms of their Risk Free Trial and Auto-Shipment Program(s) in a Clear and Conspicuous manner before getting the customer's *final* acceptance to the offer." (Emphasis added.)

The court should reject this attempt since it permits the fraudulent aspect of the IVR scheme to continue.

The defendants currently collect payment information based on a fictitious offer of product in exchange for a small shipping and processing fee. *After* collecting payment information, they disclose the terms and conditions of numerous offers, and refuse to honor the initial deal of product in exchange for shipping and processing. That is the practice the FTC prosecuted as unlawful and which was ordered ceased in *Willms.* The quoted language in the proposed settlement to this court permits Defendants to continue that same deceptive practice.

As mentioned, the deceptive practice of collecting payment information before disclosing the material terms of the offer was recently enjoined by the *Willms* court at the behest of the

---

[40] Doc 77-1, Amended Settlement, PageID 814, § 4.1(c)(ii)(2).

FTC.[41] The wording in the Settlement sneaks past this by describing 'final acceptance' but that is not the standard. A company may not collect the credit card information if any material term is not disclosed until afterwards.

The settlement agreement wording is proper if it requires that all terms and conditions of any offer are FULLY disclosed BEFORE the IVR collects any payment information. The settlement does not require that.

The released parties can continue a program which cheats the public, and now feel they have federal court approval for their acts.

## IX.    Margolis Has Filed a Class-Action Lawsuit Naming Shipley, ACMG, Marketing Architects and Hydroxatone LLC as Defendants

Objector Lisa Margolis filed a class action complaint naming ACMG and Hydroxatone LLC as defendants on July 27, 2011. She filed her First Amended Complaint on December 19, 2012.[42] Shipley, ACMG, Marketing Architects, and Hydroxatone are all named as defendants in the First Amended Complaint. Her claims are focused on the *Margolis* defendants' unlawful conduct in connection with the IVR script. First, Margolis alleges that ACMG and Hydroxatone breached their contract with her by failing to honor the offer of product in exchange for the cost of shipping and processing, which is the offer that caused her to provide her credit card information.[43] Second, she asserts a fraud claim against all of the defendants with respect to their

---

[41] *FTC v. Willms,* Case No. 2-11-cv-828-MJP (W.D. Wash. Feb. 22, 2012), Doc 106, page 10 (attached as Ex. 24).
[42] *Margolis v. Atlantic Coast Media Group LLC,* 2:11-cv-04355-SRC-CLW (D. N.J.), First Amended Complaint (Ex. 28).
[43] Margolis FAC ¶¶ 63-71.

practice of collecting credit card information based on an offer of product in exchange for the cost of shipping and processing, when that offer was not actually available.[44]

Margolis' efforts to amend her complaint to add Shipley and Marketing Architects as defendants were vigorously opposed by counsel for ACMG, but the amendment was permitted by the district court. If the proposed *Sabol* settlement is approved, including the extraordinarily overbroad  release, Margolis' claims against all of the defendants named in her amended complaint would be dismissed, in spite of the strong evidence of the defendants' fraud and damages that total more than $300 million dollars.

**X.      This Objection Is Filed by Class Member Lisa Margolis.**

This objection is filed by Lisa Margolis, 483 Longspur, Highland Heights, Ohio 44143, telephone 440-446-0489.

She called to accept the trial offer in approximately December 2010.

Her checking account was debited a total of approximately $289.63 by the defendants. The dates of the debits were as follows: December 6, 2010, January 4, 2011, January 10, 2011, February 7, 2011, February 9, 2011, and March 11, 2011.

Ms. Margolis intends to appear at the Final Approval Hearing through counsel, and her counsel intends to speak and examine witnesses at the Final Approval Hearing.

Ms. Margolis has not objected to any class settlement in the last three years.

Ms. Margolis' sworn statement verifying that she has not received a refund for her product charges and shipping and processing charges is attached as Exhibit 9.

---

[44] Margolis FAC ¶¶ 72-85.

XI.    **Conclusion.**

The proposed settlement is unfair, unreasonable, and inadequate. The defendants' entire business plan is premised on perpetrating a consumer fraud. Their deceptive business practices, which are at the heart of all of their marketing efforts, have generated hundreds of millions of dollars in income. In the face of this massive fraud, the *Sabol* plaintiffs asserted a very narrow claim for violations of a refund policy. To settle that claim on a basis that provides preferential treatment to the refund class and would allow the defendants and their accomplices to retain every penny of their illicit gains, the *Sabol* plaintiffs have sacrificed the claims of other class members that are based on an entirely different factual predicate.

The Northern District of California recently rejected a similar tactics in *Lusby v. Gamestop Inc.,* No. C12-03783, 2013 U.S. Dist. LEXIS 41794 (N.D. Cal. Mar. 24, 2013). There, plaintiff filed a limited wage and hour claim for reimbursement for unpaid security inspections that only lasted seconds or minutes. *Id.* at *40.

However, in settling the case, the defense insisted (as here) that the settlement be broadened to add a release of other claims not originally brought.

The court refused to allow this since, as here, it would include matters not encompassed by the amount of the limited fund created: "it seems that [class members] should release wage and hour claims that arise from the time spent undergoing these checks—not every conceivable wage and hour claim." *Id.* at *41.

The conduct which the court rejected is an echo of the conduct by Class Counsel and Defendant here: the "parties apparently agreed to a settlement based on an extremely narrow theory of liability. After that Class Counsel filed a complaint asserting not the narrow theory of

liability ..., but one that asserted the full range of [claims] available under state law. *Defendants appear to have purchased a broad release*[.]" (Emphasis added.) *Lusby v. Gamestop Inc.,* No. C12-03783, 2013 U.S. Dist. LEXIS 41794, at *41-42 (N.D. Cal. Mar. 24, 2013).

The court explained that approach will not be permitted.  Like the present matter, the court noted that the Proponents—as it related to the BROADENED terms and release—"did not submit any information that would enable the Court to determine that the settlement falls within the range of possible approval, including establishing the maximum recovery Plaintiff could have obtained if the action were concluded on the merits in his favor…".

Most relevant to the present case, the court rejected settlement approval where the group which started small and was funded small, but then was expanded to include vast other claims and persons without any more money for those additional claims.  The court found that the Proponents offered nothing to justify "why such a wide range of claims ... have been released with a payment that corresponds to such a small fraction of the multitudinous allegations in the complaint." *Id.* at *42.

A release of the *Sabol* refund claims for $3 million dollars would pass muster.  The attempt to use that same fund to now release over $300 million dollars of IVR claims does not. The settlement should be approved for releasing the refund claims in *Sabol* against ACMG and Hydroxatone.  It should be rejected from releasing the IVR claims from *Margolis* and from any release of any claim against Marketing Architects or Thomas Shipley.

For all of the foregoing reasons, Objector Lisa Margolis submits that the motion for final approval of *Sabol* settlement be denied.

28

DESCRIPTION OF THE EVIDENCE THAT OBJECTOR LISA MARGOLIS MAY OFFER
AT THE FINAL APPROVAL HEARING

Lisa Margolis may offer the following evidence at the Final Approval (Final Fairness) Hearing:

**<u>Live Testimony</u>**

- The testimony of Thomas Shipley regarding the *Sabol* defendants IVR sales, financial assets, and insurance coverage.
- The testimony of insurance expert John J. O'Brien regarding the matters covered in his declaration, which is attached to Margolis' Notice of Intent to Object as Ex. 1, including but not limited to the insurance coverage available to the *Sabol* defendants as well as Thomas Shipley and Marketing Architects for all claims that would be released by the *Sabol* settlement agreement.
- The testimony of forensic accountant Robert Greenwald regarding the matters covered in his declaration, which is attached to Margolis' Notice of Intent to Object as Ex. 2, including but not limited to the ability of the *Sabol* defendants to withstand a greater judgment.
- The testimony of Andrew Friedman regarding the information he requested and reviewed in the *Sabol* litigation as to (a) the claims asserted by Margolis in her First Amended Complaint, including Margolis' IVR claims; (b) the insurance coverage available to the *Sabol* defendants, Thomas Shipley, and Marketing Architects for all claims that would be released by the proposed settlement agreement; and (c) any financial evaluation of the *Sabol* defendants with respect to their ability to withstand a greater judgment, including any information that he received from a forensic accountant or individual similarly qualified to assess the collectability of the *Sabol* defendants.

**<u>Expert Declarations</u>**

EXHIBIT 1
- The declaration, with exhibits, of insurance expert John J. O'Brien.

EXHIBIT 2
- The declaration, with exhibits, of forensic account Robert Greenwald, which is attached to Margolis' which discusses the ability of the *Sabol* defendants to withstand a greater judgment.

EXHIBIT 3     • The declaration, with exhibits, of marketing expert Susan Kleimann, which discusses both the deceptive nature of the IVR that was used by the *Sabol* defendants to collect payment information from consumers who responded to offers of a risk-free trial or similar offers.

EXHIBIT 4     • The declaration, with exhibits, of class action expert Paul Flowers regarding the fairness and reasonableness of the proposed *Sabol* settlement.

## Documents Currently in Margolis' Possession

All documents referenced in and attached to Margolis' Notice of Intent to Object, and the declarations identified above, including:

EXHIBIT 5     • Chartis Insurance Policy D & O policy for ACMG, ACMG2-00056034-56126.

EXHIBIT 6     • Darwin National Assurance Company D & O policy for ACMG, ACMG2-00055972-56033.

EXHIBIT 7     • Beazley Media policy for Marketing Architects, ACMG2-00055907-55971.

EXHIBIT 8     • Great American Think Risk Liability Policy for ACMG, ACMG2-00055903-55953.

EXHIBIT 9     • Affidavit of Lisa Margolis.

EXHIBIT 10    • ACMG financial data contained in the Bates range ACMG-FS00000001-45.

EXHIBIT 11    • Hydroxatone Advertisement ACMG-00005023.

EXHIBIT 12    • Hydroxatone Advertisement ACMG-00005025.

EXHIBIT 13    • Hydroxatone Advertisement ACMG-00005031.

EXHIBIT 14    • Correspondence between Margolis' counsel and counsel for *Sabol* defendants regarding discovery conducted in *Sabol*.

EXHIBIT 15    • Correspondence between Margolis' counsel and counsel for *Sabol* plaintiffs regarding discovery conduct in *Sabol*.

EXHIBIT 16     • *Sabol* Plaintiffs' First Set of Requests for Production of Documents to Defendants Hydroxatone, LLC and Atlantic Coast Media Group, dated November 30, 2011.

EXHIBIT 17     • *Sabol* Defendants' Responses to Plaintiffs' First Set of Requests for Production of Documents, dated May 15, 2012.

EXHIBIT 18     • *Sabol* Plaintiffs' First Set of Interrogatories to Defendants Hydroxatone, LLC and Atlantic Coast Media Group, dated November 30, 2011.

EXHIBIT 19     • *Sabol* Defendants' Response to Plaintiffs' First Set of Interrogatories, dated May 15, 2012.

EXHIBIT 20     • August 17, 2012 e-mail from Andrew Friedman to Patrick Perotti re "defendants' poor financial condition".

EXHIBIT 21     • The June 11, 2012 deposition of Thomas Shipley in the matter of *Margolis v. Atlantic Coast Media Group, LLC,* 2:11-cv-04355 (D.N.J.).

EXHIBIT 22     • The June 12, 2012 deposition of Andrew Siegel in the matter of *Margolis v. Atlantic Coast Media Group, LLC,* 2:11-cv-04355 (D.N.J.).

EXHIBIT 23     • ACMG 00000076-83, IVR number 841-IVR-143, with a starting date of September 12, 2011.

EXHIBIT 24     • Stipulated Final Judgment and Order for Permanent Injunction, *Federal Trade Commission v. Willms,* 2:11-cv-00828-MJP (W.D. Wash.), Doc 106, filed February 22, 2012, prohibiting the defendant from engaging in the same conduct as alleged in the *Margolis* complaint.

EXHIBIT 25     • July 31, 2012 e-mail and attachment from defense counsel setting forth ACMG's net sales and percentage of sales by IVR.

EXHIBIT 26     • *Sabol v. Hydroxatone,* 2:11-cv-04586-KM-MAH, Doc 77-1, Amended Class Action Settlement Agreement.

EXHIBIT 27     • *Sabol v. Hydroxatone,* 2:11-cv-04586-KM-MAH, Doc 65, Second Amended Complaint.

EXHIBIT 28     • *Margolis v. Atlantic Coast Media Group LLC,* 2:110-cv-04355-SRC-CLW (D.N.J.), Doc 59, First Amended Complaint.

EXHIBIT 29 • *Margolis v. Atlantic Coast Media Group LLC,* 2:110-cv-04355-SRC-CLW (D.N.J.), Doc 63, Memorandum in Opposition to Lisa Margolis' Motions to Consolidate, to Appoint Patrick Perotti as Lead Counsel in the Consolidated Action, and for an Immediate Hearing on the Tentative Settlement of Margolis' Claims Negotiated by the parties in Gray v. Hydroxatone, LLC

EXHIBIT 30 • *Sabol v. Hydroxatone,* 2:11-cv-04586-KM-MAH, Doc 92, Memorandum in Support of Plaintiffs' Motion for Final Approval of the Proposed Settlement

## Categories of Documents Requested from Proponents of the *Sabol* Settlement, but Not Provided to Magolis

Margolis is unable to provide a *detailed* description of the following items and documents, because they have not been produced to her. Nevertheless, they are all relevant to the fairness and reasonableness of the settlement, and if produced to her, may be offered into evidence at the Fairness Hearing.

• The Confidential Settlement Letter submitted by *Sabol* defendants as part of their mediation efforts. This letter is relevant to the issues of the value of the claims asserted by *Sabol* and the ability of the defendants to withstand a greater judgment.

• Documents reflecting Thomas Shipley's compensation. Shipley is a defendant in the *Margolis* litigation, and the claims against him would be released as part of the *Sabol* settlement. His ability or inability to contribute to the *Sabol* settlement is relevant fairness and reasonableness of the settlement.

• Marketing Architects' financial statements. Marketing Architects is a defendant in the *Margolis* litigation, and the claims against it would be released as part of the *Sabol* settlement. Its ability or inability to contribute to the *Sabol* settlement is relevant fairness and reasonableness of the settlement.

• Documents relating to Atlantic Coast Media Group's financial condition, including: receivables as of October 31, 2012; accounts receivable against for 2009-2011; 2010 prepaid expenses; direct operating expenses for 2009-2011; G&A 2009-2011; COGS 2009-2011; and information provided to lenders in connection with loans and credit lines extended to ACMG. These documents are relevant to ACMG's ability to withstand a greater judgment

- Sabol discovery not yet provided to Margolis.

- Correspondence between the released parties and their insurers with respect to coverage for the claims asserted in either the *Sabol* or *Margolis* litigation. These documents are relevant to the fairness and reasonableness of the settlement in terms of the released parties ability to contribute to the settlement.

- Correspondence between the attorneys representing the plaintiffs and defendants in the *Sabol* litigation. These documents are relevant to determining the value of the *Sabol* claims; the value of the claims being released that were not asserted by the *Sabol* plaintiffs; the original terms of the settlement immediately after mediation, and how the settlement has evolved since mediation to incorporate additional claims, if at all; what efforts were made to determine if all of the released parties could or should contribute to the settlement; and, the parties views of the strengths and weaknesses of the *Sabol* claims. All of these issues are relevant to the fairness and reasonableness of the settlement.

- Data from the claims administrator regarding the number of claims made by each group of claimants. This information is relevant to determining the class's response to the settlement.

Respectfully submitted,

DWORKEN & BERNSTEIN CO., L.P.A.
Patrick J. Perotti (OH #0005481)
James Timmerberg (OH #0067499)
60 South Park Place
Painesville, Ohio 44077
(440) 352-3391

RONALD A. MARGOLIS (OH #0031241)
Bonezzi Switzer Murphy Polito & Hupp Co LPA
1300 East 9th Street,  Suite 1950
Cleveland, OH  44114
(216) 875-2068

CROWLEY & CROWLEY
Noel C. Crowley (NJ #NC3712)
20 N. Park Place, Suite 206
Morristown, New Jersey 07960
(973) 829-0550

JAVERBAUM WURGRAFT HICKS
KAHN WIKSTROM & SININS
Rubin Sinins (NJ #RS8325)
Gerald H. Baker
505 Morris Ave.
Springfield, NJ 07081
(973) 379-4200


By: */s/ Rubin Sinins*

Attorneys for Objector, Lisa Margolis


Dated:  June 16, 2013


### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),

and paper copies will be sent to those indicated as non-registered participants today (June 16,

2013).

By: */s/ Rubin Sinins*

One of the Attorneys for Objector, Lisa
Margolis

34