------------------------------------- X

SUSAN SABOL, VALERIE DONE, and
KATHLEEN KLODNER on behalf of
themselves and all others similarly
situated,

                  **Plaintiffs,**

   -against-

HYDROXATONE LLC and ATLANTIC
COAST MEDIA
GROUP LLC,

               **Defendants.**

------------------------------------- X

**CIVIL ACTION NO.
2:11-cv-04586-KM-MAH**

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on the Plaintiffs' motion for final approval of a proposed settlement, award of attorneys' fees, reimbursement of expenses, and participation awards. (Docket No. 91). I am simultaneously signing an Order granting final approval to the proposed Amended Settlement Agreement ("ASA"). My essential findings as to the relevant factors are contained therein. I write separately to address the objection asserted by one class member, Lisa Margolis.[1] (Docket No. 104).

I accepted voluminous proofs from the parties and from Ms. Margolis as objector, and I held a Fairness Hearing with respect to the proposed settlement. Before the hearing, Ms. Margolis received access to all discovery produced by the parties, and all documents related to the financial health of the Defendants

---

[1] In this opinion, Lisa Margolis is referred to as "Ms. Margolis." Her attorney, who is also her husband, is referred to as "Robert Margolis" or "Mr. Margolis."

exchanged by the parties during confirmatory discovery, as well as information regarding the Defendants' insurance coverage. *See* Docket Nos. 98, 99, 103. With two potential exceptions, discussed herein, the parties and Ms. Margolis waived the right to present testimony or cross-examine, and relied on the documentary evidence and oral arguments of counsel.

I have considered Ms. Margolis's objection, along with all related material and exhibits, including some that Plaintiffs sought to exclude from consideration. Giving due deference to the negotiated settlement, and due consideration to the recommendation of the highly regarded and experienced mediator in this case, Hon. Stephen M. Orlofsky (ret.), I overrule Ms. Margolis's objection.

**Introduction**

A class action offers significant procedural advantages, especially in a case like this one, where a defendant has allegedly hurt a lot of people just a little. It affords a remedy for claims that might not have been efficiently pursued one-by-one. And, by holding out the potential of an award of attorney's fees, it gives counsel the incentive to pursue widely-dispersed claims on behalf of class members who, by definition, are not present in court. With those advantages come certain pitfalls. In social science jargon, class actions address a collective action problem, but, in doing so, may create externalities.

Generally, these concerns arise from the difficulty of asserting the presumed rights and interests of persons who are not present to speak for themselves. That concern is particularly poignant when a settlement is

proposed. By its nature, the settlement of a class action may compromise the rights of absent persons and extinguish their claims. Defendants of course have an interest in minimizing the amount of a settlement. Arm's length bargaining and the best efforts of reputable counsel will often, perhaps usually, ensure that the settlement is fair to the class. Class counsel's interest in maximizing the settlement, however, may wane as the prospect of a fee grows imminent. Ultimately the court must be satisfied that the settlement is fair.

The factors that a court must consider are well-settled, and I have considered them. I pause at the outset, however, to note that this settlement does not bear any strong indicia of potential unfairness to absent class members.

First, this claim does not involve physical injury, property damage, or even a defective product; it is pure consumer dissatisfaction claim. The injury, if any, is suffered only by purchasers of skin cream who wanted to return the product for some reason, or who changed their minds about participating in the automatic-shipment plan. Many customers seemingly were happy with the product and content to keep it.

Second, the number of claims is far from overwhelming, and objections to the settlement are vanishingly few. Over 2.5 million notices of settlement went out. Fukunaga Decl., (Docket No. 94-9). As of July 16, 2013, only about 36,000 purchasers, or about 1.4%, had submitted claims.[2] A total of two class members, including Ms. Margolis, submitted timely actual objections.

---

[2] A declaration submitted on August 15, 2013, contains an updated figure of 41,813. Shipley Decl. (Docket No. 148-1) ¶ 9 (table).

Third, the objection of Ms. Margolis is of a special nature. Class members commonly object, claiming that the plaintiffs' attorneys should have obtained a larger payment on their claims.[3] Ms. Margolis, by contrast, comes to court, not only as a class member, but as the sole named plaintiff in a rival putative class action. She and her counsel, who also happens to be her husband, declined to participate in the negotiations that produced the proposed settlement here. Rather, they tried to consolidate this action with their own, obtain various forms of discovery, and challenge or delay the settlement of this action. Failing that, they have attempted to establish that their action asserts distinct claims that should not be released by this settlement. Toward that end, in their own action they have revised the alleged facts underlying Ms. Margolis's claim and added defendants, threatening to draw this settlement into collateral litigation involving other claims and parties. This objection is, at least in part, the continuation by other means of a struggle among counsel for control of the litigation.

Fourth, retired Judge Stephen M. Orlofsky presided over the mediation between the parties in which they reached agreement on the key terms of the settlement before me. His declaration states his belief that the terms of the agreement were "fair, adequate, reasonable, and in the best interest of the Plaintiffs and the proposed class." Orlofsky Decl., (Docket No. 122), ¶ 14. Judge Orlofsky stated that negotiations were hard fought without indication of "any collusion between any persons or parties." *Id.* ¶ 16.

---

[3] Of course, a class member who feels strongly enough is free to opt out and pursue her claims individually, in small claims court if necessary.

## I. BACKGROUND

### A. *The* Margolis *and* Sabol *Actions*

Ms. Margolis is the named plaintiff in a separate putative class action against the Defendants, which is assigned to District Judge Chesler. *Margolis v. Atlantic Coast Media Group LLC*, No. 2:11-cv-04355-SRC (the "*Margolis* Action"). The *Margolis* Action was filed on July 27, 2011. *Margolis* Compl., No. 2:11-cv-04355-SRC, (Docket No. 1). In that complaint, the representative plaintiff, Ms. Margolis, asserts claims on behalf of consumers allegedly defrauded by the Defendants in connection with purchases of these skin care products. *Id.*; (Docket No. 96 at 2). She is represented in that action by her husband, Robert Margolis, Esq.

In the *Margolis* Action complaint as originally filed, Ms. Margolis alleged that she spoke with a live agent when she signed up for Hydroxatone products. *See Margolis* Compl. ¶¶ 10–12. This will be important later on.

This class action lawsuit, *Sabol v. Hydroxatone LLC* ( the "*Sabol* Action"),[4] was commenced against Hydroxatone and Atlantic Coast Media Group ("ACMG") on August 8, 2011. (Docket No. 1). On February 7, 2012, Plaintiffs Susan Sabol and Valerie Done filed a Second Amended Complaint (the "*Sabol* SAC"). (Docket No. 65). The *Sabol* SAC alleged deceptive customer service practices relating to Hydroxatone's risk-free trial offers and auto-shipment of products. *Id.* ¶ 2. The claims related to customers who received unordered

---

[4] The lead plaintiff in the *Sabol* Action was initially Tami Gray. Susan Sabol was substituted in for Gray on March 23, 2012. (Docket Nos. 29–30). For the sake of simplicity, the "*Sabol* Action" will refer to the case both before and after the substitution.

products, changed their minds, or were otherwise dissatisfied with their purchases. *See id.* ¶¶ 1, 13. Defendants allegedly, *inter alia,* failed to credit customer returns, and failed to cancel memberships in the auto-shipment programs as customers had a right to expect based on Defendants' standard representations in connection with the ordering process. *See id.* ¶¶ 26 – 43.

### B. *Mediation and Settlement Agreement*

The *Sabol* Action progressed more rapidly than the *Margolis* Action. In June 2012, Defendants' counsel contacted *Sabol* Class Counsel to suggest a meeting to discuss the possibility of settlement. Def. Opp. to Consolidation, No. 2:11-cv-04355-SRC, (Docket No. 64), at 4. Counsel for the Plaintiffs requested discovery regarding the Defendants' sales and financial status in advance of any settlement negotiations, which was produced on July 10, 2012. *Id.* at 5. The parties met on July 17, 2012, to discuss settlement. *Id.* at 5. At the conclusion of that meeting, the parties had not agreed to any of the terms of the settlement, but did agree that additional negotiations with a mediator would be helpful. *Id.* at 5 – 6. The next day, the parties advised the magistrate judge then assigned to *Sabol* that they were working towards a resolution of the putative class claims. *See* Joint Letter, (Docket No. 49) (proposing Joint Stipulation and Consent Order for Stay); Joint Status Report, (Docket No. 51).

The parties engaged Hon. Stephen Orlofsky (Ret.) and exchanged data in advance of the mediation. *Id.* at 6. Class Counsel made several requests for additional information from the Defendants, including sales data, customer return/refund data, return/refund policies and record-keeping facilities, and

insurance coverage information, which was provided by the Defendants on August 5, 2012. *Id.* On August 14, 2012, the parties in the *Sabol* Action participated in a mediation session before Judge Orlofsky and reached a tentative agreement on the key terms. *Id.* at 3, 7; *see also* Joint Letter, (Docket No. 49); Order Denying Consolidation, No. 2:11-cv-04355-SRC, (Docket No. 79), at 3; *Sabol* Plaintiffs' Opp. to Consolidation, No. 2:11-cv-04355-SRC, (Docket No. 63), at 5 – 6. Margolis was apprised of the mediation. Order Denying Consolidation at 3.

On August 17, 2013 Magistrate Judge Hammer entered an Order staying the *Sabol* action for sixty days so the parties could formalize the settlement and conduct confirmatory discovery. (Docket No. 50). The parties then filed a Joint Status Report on August 21, 2013, regarding the status of the settlement and discovery. (Docket No. 51). The parties reported that fact discovery was not yet complete although a tentative agreement had been reached. *Id.* at 2. The completion of confirmatory discovery was scheduled for November 20, 2012, and the parties had not yet conducted expert discovery. *Id.* The parties did not request a settlement conference because they were working on draft settlement papers with the aid of Judge Orlofsky. *Id.* at 3.

On October 23, 2012, the Court granted the parties an additional sixty days to formalize the settlement and complete discovery. (Docket No. 56). On January 3, 2013, this Order was again extended an additional thirty days until February 4, 2013. (Docket No. 60).

    C.    *The* Margolis *Amended Complaint*

Although invited to do so in August 2012, Ms. Margolis declined to participate in the *Sabol* Action negotiations. *See* Def. Opp. to Consolidation, No. 2:11-cv-04355-SRC, (Docket No. 63), at 3, 7; Order Denying Consolidation, at 3; Opp. to Objection, (Docket No. 119), at 11; Friedman Decl., (Docket No. 94), ¶ 17. The parties dispute the timing and content of the *Sabol* Action parties' disclosure of settlement negotiations to counsel for Margolis. However, August 2012 emails between *Sabol* Class Counsel and counsel for Ms. Margolis (Mr. Perotti and Mr. Margolis) confirm that Ms. Margolis declined to participate in the settlement discussions. *See* Exhs. A – B, Def. Opp. to Consolidation, No. 2:11-cv-04355-SRC, (Docket Nos. 63-1, 63-2). Counsel for the *Sabol* Action Plaintiffs contacted Patrick Perotti and Nicole Fiorelli on August 15, 2012—the day after the mediation. Def. Opp. to Consolidation at 7. The following day, Class Counsel participated in a telephone call with Mr. Perotti regarding the settlement negotiations, and requested that they participate in a joint settlement. *Id.*

Instead, on September 7, 2012, Ms. Margolis moved to amend her complaint in the *Margolis* Action. No. 2:11-cv-04355-SRC (Docket Nos. 48–49). A copy of the proposed *Margolis* Amended Complaint ("*Margolis* AC") was attached to the motion. *Id.*; No. 2:11-cv-04355-SRC, (Docket No. 59). On December 19, 2012, Magistrate Judge Waldor granted the motion to amend. Order, No. 2:11-cv-04355-SRC, (Docket No. 58).

The modifications reflected in the *Margolis* AC are aimed at distinguishing the *Margolis* Action from the *Sabol* Action. One such

modification was an allegation that Ms. Margolis signed up for a free trial, not through a live telephone agent, but through an automated interactive voice response ("IVR") system. *Margolis* AC ¶ 36. She thus purports to represent a class of plaintiffs who participated in the free trial through an IVR system. *Margolis* AC ¶ 54. This, Ms. Margolis believes, is a class distinct from that in the *Sabol* action. These new allegations directly contradict the allegations of the original *Margolis* Action complaint, in which Ms. Margolis alleged that she signed up to purchase Hydroxatone products through a live agent. *Margolis* Compl. ¶¶ 10 – 12.

The *Margolis* Amended Complaint also adds two defendants not named in the *Sabol* complaint: Thomas Allan Shipley and Marketing Architects. *Margolis* AC ¶¶ 10–14. Shipley was the chief executive officer of ACMG and Hydroxatone. Shipley Decl. ¶ 2. The *Margolis* AC alleges that Shipley participated in creating the marketing program and IVR system. *Margolis* AC ¶ 10. Marketing Architects provided marketing consulting services to Hydroxatone. *See* Opp. to Objection at 18. Marketing Architects, says Ms. Margolis, should be liable because it co-authored certain advertisements and assisted with the set-up of the IVR system. *Margolis* AC ¶¶ 12–14, 81; Opp. to Objection at 13.

### D. Margolis *Motion to Consolidate and Submission of the* Sabol *Settlement Agreement*

On January 11, 2013, less than a month after she filed the *Margolis* AC and while the settlement agreement in *Sabol* was still being finalized, Ms.

Margolis moved before Judge Chesler to consolidate the *Sabol* Action with the *Margolis* Action. Motion to Consolidate, No. 2:11-cv-04355-SRC, (Docket No. 61). In that motion, counsel for Ms. Margolis asked to be appointed lead counsel over the consolidated cases. *Id.* It is inferable, and indeed was explicit, that Ms. Margolis feared that her class claims would be mooted by a settlement in the *Sabol* Action. *See id.* at 2, 4 (stating that parties in *Sabol* intended to moot her claim and those of her putative class through a global settlement); Order Denying Consolidation at 3. The motion further alleged that the parties to *Sabol* intentionally withheld this information from Magistrate Judges Waldor and Hammer because they were "involved in collusive settlement negotiations." *Id.*

On February 7, 2013, while the consolidation motion was pending, the Defendants and Plaintiff class representatives in the *Sabol* Action signed a settlement agreement. They submitted a detailed Amended Settlement Agreement ("ASA"), to this Court for preliminary approval. (Docket Nos. 66, 68).

Shortly thereafter, on March 6, 2013, Magistrate Judge Waldor denied Ms. Margolis's pending motion to consolidate the *Margolis* and *Sabol* Actions. Order Denying Consolidation at 2. Magistrate Judge Waldor reasoned that consolidation would prejudice the parties in the *Sabol* Action, delay consideration of the settlement, increase costs, and fail to save judicial resources. *Id.* at 6. Judge Waldor's Opinion noted that if the proposed settlement in the *Sabol* Action encompassed the claims of Ms. Margolis (and her putative class), she could still object to the settlement. *Id.* Judge Waldor

also pointed out that an objection filed in the *Sabol* Action settlement was the more appropriate forum for addressing her claims of collusion and reverse auction. *Id.* at 6–7 (citing Margolis' Rely Brief, No. 2:11-cv-04355-SRC (Docket No. 68), at 4.

E. *Preliminary Approval of Settlement, Notice to Class*

On March 28, 2013, in the *Sabol* action, this Court granted preliminary approval of the ASA ("Preliminary Approval Order"). (Docket No. 80). The Court directed the parties to provide notice of the proposed settlement to the Class and scheduled a hearing to determine whether the settlement was fair, reasonable and adequate. *Id.* at 17.

My Preliminary Approval Order directed Class Members who objected to the settlement to file written notices of intent to object. It advised any such objectors that they would be permitted to appear and be heard at the fairness hearing, either in person or by counsel. Preliminary Approval Order at 12–13.

F. *Ms. Margolis Attempts to Intervene in Anticipation of Filing an Objection*

On behalf of Ms. Margolis, Attorney Rubin Sinins (as local counsel of record) entered an appearance in the *Sabol* Action on May 16, 2013. Simultaneously, he alerted the Court that Ms. Margolis intended to object to the settlement. (Docket No. 89). At that time, defense counsel had refused her discovery request for relevant documents because she had not yet filed an objection. *See id.* at 2. Ms. Margolis argued that she needed the documents first, and requested a telephone conference with Magistrate Judge Hammer. *Id.*

On May 21, 2013, Class Counsel Andrew Freidman provided the written

discovery that Ms. Margolis had originally requested. (Docket No. 96, Exh. 10). On May 22, 2013, Ms. Margolis requested additional documents for use by an expert whose affidavit she intended to submit with her objection. (Docket No. 96, Exh. 11). Defense counsel did not comply with that request. (Docket No. 96, Exh. 12).

On June 5, 2013, Ms. Margolis filed a letter with this Court regarding the discovery dispute. (Docket No. 96). Ms. Margolis informed this, the *Sabol* Court, of her pending action before Judge Chesler. *See id.* at 2–3. Previewing her to-be-filed objection, she framed the allegations in the *Margolis* Action as being based on deceptive practices surrounding the IVR. *Id.* These IVR allegations she portrayed as being distinct from the refund policy at the center of the *Sabol* Action. *Id.* at 2. And she alleged that Shipley and Marketing Architects were implicated in the deceptive IVR scheme. *Id.*

Ms. Margolis's proffered objection was essentially that, while the proposed settlement in the *Sabol* Action purported to cover and release her claims, it did not provide any additional funding for them. *Id.* In support of such an objection, she sought the Court's assistance in obtaining additional discovery. Specifically, Ms. Margolis's letter requested:

1. The confidential settlement letter submitted by the *Sabol* Action defendants as part of their mediation efforts;

2. Information regarding Thomas Shipley's compensation;

3. Financial statements from Marketing Architects;

4. Financial information relating to the assertion of ACMG that

Defendant Sabol could not afford a larger judgment;

5. All discovery produced in the *Sabol* Action;

6. Correspondence between released parties and their insurers relating to coverage for the claims asserted in both actions; and

7. Correspondence between attorneys for the *Sabol* Action plaintiffs and attorneys for the parties released by the settlement agreement.

(Docket No. 96 at 4–7).

Class Counsel for the *Sabol* Plaintiffs responded to Ms. Margolis's letter on June 7, 2013, representing to the Court that Ms. Margolis had already been given access to: (1) "all discovery" produced by Defendants in the *Sabol* Action; (2) the same financial data that was produced to Class Counsel in the *Sabol* Action (including audited financial statements and projections); and (3) all insurance policies that "arguably covered the claims" made against the defendants in both the *Sabol* and *Margolis* actions. (Docket No. 99 at 2). Further documents, said Class Counsel, were not "relevant to the fairness or adequacy" of the settlement. *Id.* In particular, Class Counsel contested the requests for the confidential settlement letter and correspondence between Class Counsel and Defendants' counsel, which lay outside the scope of discovery and related to confidential settlement negotiations. *Id.* at 2–3.

Counsel for the Defendants also objected to Ms. Margolis's additional requests. (Docket No. 103). Defendants argued that Ms. Margolis lacked standing to pursue a remedy from the Court because she had not yet filed an objection; they noted that they nevertheless had provided her with copies of all

the documents relating to the financial status of the Defendants that had been exchanged in the mediation. *Id.* at 2. The Defendants further opposed Ms. Margolis's requests for information on Shipley and Marketing Architects. *Id.* at 3.

Ms. Margolis's counsel filed additional letters on June 10, 2013, and June 12, 2013, renewing discovery requests. (Docket Nos. 101, 102). Ms. Margolis argued that the requested documents were "highly relevant" to her objection because they would be probative of the Defendants' ability to withstand a greater judgment. (Docket No. 101 at 2). The Defendants again refused her request. (Docket No. 103).

On July 8, 2013, the *Margolis* Action was stayed by Magistrate Judge Cathy Waldor. Order, No. 2:11-cv-04355-SRC, (Docket No. 104).

### G. *Ms. Margolis's Written Objection, as Supplemented at the Hearing*

The Preliminary Approval Order set a deadline of June 16, 2013, for the filing of objections. *See* Order, Docket No. 80 at 13 – 14 (setting deadline at 30 days prior to Fairness Hearing).

The only substantial objection came from Ms. Margolis.[5] (Docket No. 104). Ms. Margolis's objection, filed on June 16, 2013, raises the following

---

[5] The Court received eleven timely "objections" to the proposed settlement. Nine of these were not really objections at all; they are more properly viewed as opt-outs, or as claims under the ASA. *See* Docket Nos. 82–87, 88, 90, 104. Mr. Joseph P. Lussier objected that the amount of attorneys' fees to be awarded was far higher than his individual recovery. (Docket No. 87 at 1). I considered that rather generic objection and overruled it in my final approval of the settlement. Another objection was recently received on November 12, 2014 from Ms. Mary F. Carr. (Docket No. 151). Regardless of its timeliness, or lack thereof, it is also overruled in my final approval of the settlement.

issues: (1) the settlement's common fund of $3 million falls short because the potential value of claims is over $300 million; (2) there is not sufficient evidence showing that the Defendants could not withstand a larger settlement or that Thomas Shipley and Marketing Architects should be released from liability without contributing to the settlement amount; (3) the settlement amount does not take into account $13 million in additional insurance coverage; (4) the release of claims is overbroad because it releases claims in the *Margolis* Action that have a "separate factual predicate"; (5) the settlement preferentially treats a subset of class members by making a cash reward available only to "refund" class members and not to "IVR" members; and (6) the settlement does not deter the Defendants' deceptive conduct. Margolis Br., (Docket No. 104), at 1–2.

Ms. Margolis's papers in support of her objection consisted of: (1) an expert report from insurance expert John O'Brien (Docket No. 104-1); (2) declaration of Robert Greenwald, CPA, regarding Defendants' financial status (Docket No. 104-2); (3) declaration of marketing consultant Susan Kleimann (Docket No. 104-3); (4) affidavit of Paul W. Flowers Esq. regarding reasonableness of the settlement; (5) copies of Defendants' insurance policies (Docket Nos. 104-5 – 104-6, 104-8); (6) a copy of Marketing Architects insurance policy (Docket No. 104-7); (7) an affidavit from herself (Docket No. 104-9); (8) ACMG financial statements (Docket No. 104-10); (9) marketing scripts used by the Defendants (Docket No. 104-11 – 104-13, 104-23); (10) correspondence between counsel for Ms. Margolis and *Sabol* Action parties (Docket No. 104-14 – 104-15, 104-20); (11) document production requests,

interrogatories, and responses from the *Sabol* Action (Docket No. 104-16 – 104-19); (12) Thomas Shipley's deposition transcript from the *Margolis* Action (Docket No. 104-21); (13) Andrew Siegel's deposition transcript from the *Margolis* Action (Docket No. 104-22); (14) *FTC v. Willms* consent order and judgment (Docket No. 104-24); (15) customer and sales data produced by Defendants under protective order during settlement negotiations (Docket No. 104-25); (16) the *Sabol* ASA (Docket No. 104-26); (17) SAC (Docket No. 104-27); (18) *Margolis* AC (Docket No. 104-28); (19) *Sabol* Plaintiffs' Opp. to Motion to Consolidate (Docket No. 104-29); and (20) Plaintiffs' Memorandum in Support of Motion for Final Approval of Proposed Settlement (Docket No. 104-30).

After filing her objection, Ms. Margolis filed two additional motions: a motion for leave to file four additional exhibits (Docket No. 134), and a motion for leave to file a consolidated reply in response to the Plaintiffs' Reply Memorandum in Further Support of Motion for Final Approval and to Defendants' Memorandum of Law in Opposition to the Margolis Objection (Docket No. 135). I heard oral argument on those applications at the fairness hearing. July 16, 2013 Fairness Hrg. Transcript (Docket No. 149 at 49, 71) (one volume, hereinafter cited as "T _").

Although these four additional exhibits were submitted after the objection deadline, I hereby grant the motion to include them in the record. They are: (1) a supplemental report by John O'Brien, Ms. Margolis's insurance expert; (2) a transcript of a recorded conversation between Ms. Margolis and the Defendants' customer service representative that occurred after her order

was placed; (3) an IVR script from November 2010 offering Wal-Mart and Target gift cards; and (4) the script that Defendants allege was used when Ms. Margolis placed her order. (Docket No. 134 at 1–2). Item 1, the supplemental report from John O'Brien, I have accepted and considered for its appropriate purpose. *See* pp. 18, 31, *infra*. Items 2, 3, and 4, says Ms. Margolis, are relevant to rebut Defendants' contention that she did not make an IVR purchase. (Docket No. 134 at 2). I have considered them on that issue. *See* p. 19, *infra*.

I deny the motion to submit a consolidated reply. An additional submission would be superfluous, because all of the relevant information is before the Court and I have already reviewed it.

The Defendants filed under seal an Opposition to Ms. Margolis's Objection. Opp. to Objection, (Docket No. 119). The Opposition is supported by affidavits from the Settlement Administrator, Jill Fukunaga (Docket No. 120); counsel for Defendants Laura Mazzuchetti (Docket No. 121); the mediator, Hon. Stephen M. Orlofsky (Ret.) (Docket No. 122); and Thomas Shipley (Docket No. 123).

### H.    *Fairness Hearing*

The Preliminary Approval Order (Docket No. 80) set a Fairness Hearing for July 16, 2013. The parties appeared through counsel. The only objector to appear was Ms. Margolis, through her counsel, Robert A. Margolis, Esq. T 3–4.

At the hearing I heard arguments from both parties and Mr. Margolis regarding the proposed settlement, and in particular, the framework for both

the settlement negotiations between the parties and the background for Ms. Margolis' Objection.

In addition to the docketed requests to file (1) four additional exhibits and (2) a consolidated reply already discussed (Docket Nos. 134 – 135), counsel for Ms. Margolis also requested that the Court permit them to take the deposition of Marketing Architects, and to offer live testimony from their insurance expert, O'Brien. T 75. Mr. Margolis then conceded that live testimony from O'Brien would not be necessary if the Court accepted the two reports submitted in lieu of his testimony. *Id.* at 75, 91. Counsel for the Defendants vigorously opposed both requests. *Id.* at 86 – 89, 92.

The issue of deposing Marketing Architects was left open at the conclusion of the hearing. *See id.* at 91. Ms. Margolis had sufficient information on Marketing Architects for her Objection, including its insurance policy that her counsel argues would potentially provide coverage (Docket No. 104-7) and deposition testimony from Mr. Shipley and Mr. Siegel regarding the Defendants' relationship with Marketing Architects (Docket Nos. 104-21, 104-22). *See* T 64 – 67. Finding no justification for further discovery, I will deny the request for a deposition.

I have, however, admitted and considered both of O'Brien's insurance expert reports. Mr. Margolis agreed to the Court's acceptance of these reports in lieu of O'Brien's live testimony, and I have considered them as part of the Margolis objection. *See* T 75, 91.

Beyond these two specific issues, neither the parties nor Ms. Margolis

sought any additional opportunity for live testimony or cross examination. T 91. At the conclusion of the hearing, I granted Mr. Margolis a week to digest the discovery he had received from the parties, and to submit any additional declarations relating thereto. *Id.* at 92. Decision was reserved on both the requests made by Mr. Margolis and on the proposed settlement.

Following the hearing, counsel for Ms. Margolis did not submit any additional declarations. With leave, defense counsel filed a corrected and supplemented Shipley declaration after the hearing. (Docket 148-1).

## II. Ms. Margolis's Objection

### A. Standard of Review

Ms. Margolis's objection must be reviewed in light of the general principle that the law favors settlement, particularly in class actions where substantial judicial resources may be conserved by avoiding litigation. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (citing Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41, at 11–85 (citing cases); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976)). "The strong judicial policy of favoring class action settlement contemplates a circumscribed role for the district courts in settlement review and approval proceedings." *Erheart v. Verizon Wireless*, 609 F.3d 590, 594 – 95 (3d Cir. 2010). The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998)

(citing *Girsh v. Jepson*, 531 F.2d 153, 156 (3d Cir. 1975)).

In exercising that broad discretion, the Court should consider the following factors:

> "(1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . .."

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). I have considered the *Girsh* factors and made the necessary findings in my Order approving the settlement. To the extent they are specifically relevant to the objection, however, I touch on them here and in Section III, *infra*.

## B. Ms. Margolis's Standing to Make IVR-based Objection

One essential premise of Ms. Margolis's objection is that the proposed settlement fails to recognize that the IVR-based claims she alleges in the *Margolis* Action are distinct from the *Sabol* Action claims. The *Margolis* and *Sabol* Actions, according to Ms. Margolis, have "different factual predicates." *Id.* at 5. Ms. Margolis contends that her IVR-based claims should not be released in the *Sabol* Action settlement.

There is a threshold problem with this objection, according to the Defendants. They contend that Ms. Margolis lacks standing to bring her

objection as an IVR purchaser, because she herself did not purchase through the IVR system. Opp. to Objection at 1–2 (citing *Wal-mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)).

As noted above, the original *Margolis* Action complaint alleged that Ms. Margolis spoke to a live agent when she signed up for Hydroxatone products in December 2011. *See Margolis* Compl. ¶¶ 10–12. Nor was this a slip of the pen. In February 2012, Ms. Margolis provided a written interrogatory response stating that, when she called the Defendants to accept their offer, "[t]he employee or agent of Defendants with whom Plaintiff spoke attempted to sell her numerous other products." Mazzuchetti Decl., Exh. B (Docket No. 121-2), at 11-12.

Almost immediately after the August 2012 mediation resulted in a framework for the settlement in *Sabol*, Ms. Margolis moved to amend her complaint in the *Margolis* Action. Contradicting the original complaint, the *Margolis* AC alleges that Ms. Margolis purchased her Hydroxatone products through the automated IVR system. *Margolis* AC ¶ 36. She purports to represent a class of customers who did likewise. *Id.* ¶ 54. According to the *Margolis* AC, consumers expected to pay little or nothing, but, through the IVR system, were lured into further purchases and were charged a minimum of $69.95. *See id.* ¶¶ 18 – 52. Ms. Margolis also alleges that Marketing Architects is liable because it contracted with ACMG to jointly operate the IVR system, produce commercials, and prepare scripts. *Id.* ¶¶ 11 – 14.

The Defendants have submitted persuasive evidence that Ms. Margolis

was right the first time: she dealt with them through a live agent, not the IVR system. Shipley Decl., (Docket No. 123), ¶¶ 29–32 (filed under seal), *amended by* Shipley Decl., (Docket No. 148-1), ¶¶ 3-8. Records demonstrate that when Ms. Margolis placed the call, it was received by a live agent call center operated by Hydroxatone's vendor, Northside. *Id.* That call center used only live operators, not the IVR system. Shipley Decl. (Docket No. 148-1) ¶¶ 6-8; *see also* T 48 – 49.

The parties contend that Ms. Margolis's attempt to revise the facts underlying her own claim raises questions as to her motivations, but I need not resolve them. I am bound in any case to consider the potential benefit to the class. And from that perspective, the Defendants' argument does not entirely succeed as a standing argument. It is perhaps unlikely that Ms. Margolis would have standing to assert the rights of IVR purchasers in her own action. It is uncontested, however, that Ms. Margolis is a member of the *Sabol* class. As such, she may object to the settlement on the basis that a larger pool of funds might have produced a larger settlement, which would have benefited her.

Ironically, this theory of standing undermines the premise of Ms. Margolis's objection, which is that the claims in the two actions are separate and distinct. They are not. The class defined in the *Sabol* SAC includes *all* purchasers of the "risk-free trial" from Hydroxatone: both live-operator and IVR customers. *See Sabol* SAC ¶ 13. Likewise, the settlement class in the ASA covers customers who purchased through *either* the IVR system or a live

operator. ASA § 3.1. Indeed, named Plaintiff Susan Sabol herself placed her order through the IVR system. Opp. to Objection at 13 n. 4. Of the 2.6 million class members, IVR customers make up approximately 50.2%. Shipley Decl., (Docket No. 148-1), ¶ 9. And IVR customers are proportionally represented in the far smaller class of approximately 41,813 claimants; of those claimants, approximately 49.58% are IVR customers. *Id.*

The fundamental distinction suggested by Ms. Margolis is no distinction at all. But irrespective of the manner in which she purchased the products, Ms. Margolis is a member of the *Sabol* class. That circumstance may or may not bear on the strength of her objection, but it does give her standing to object.

### C. Specific Objections to the Proposed Settlement

#### 1. The Settlement Amount is Disproportionate to the Value of the Claims.

Ms. Margolis's major contention is that the dollar amount of the settlement is insufficient; this theme runs through all of the sub-points of her objection. The total cash payment in the Common Fund of the ASA is $3 million. ASA § 4.1(a)(i) (claimants in group 2 get free products, rather than cash). Attorney's fees and costs, participation awards, administrative costs, and costs of the notice will be paid out of the Common Fund prior to any distribution to the Settlement Class. ASA § 4.1(a)(ii). Ms. Margolis argues, however, that the marketing practices used by the Defendants resulted in over $300 million collected from consumers through fraudulent charges. Margolis Br. at 9, 12.

The *Sabol* Action settlement, Ms. Margolis says, does not address the

potential value of these claims, which would be released by the settlement. *Id.* at 7. Rather, the *Sabol* Action lawsuit addresses only a sub-category of potential refund claims, valued at approximately $10 million dollars. In her view, the $3 million dollar ASA cash amount addresses only the refund claims, but releases liability for a much larger pool of IVR claims. *Id.* at 5. Ms. Margolis also notes that the settlement amount does not account for the liability of Shipley and Marketing Architects (who are named as Defendants in the *Margolis* Action, but not the *Sabol* Action). *Id.* Ms. Margolis contends that both Shipley and Marketing Architects played substantial roles in implementing the deceptive IVR-related practices alleged in her suit. *Id.* at 10. The $3 million dollar amount offered by the ASA, she contends, is therefore unreasonable in comparison to the vast recovery promised by her own IVR-based action. *Id.* at 14.

Ms. Margolis arrives at her $300 million calculation, she says, by taking the percentage of Defendants' sales through IVR out of the total amount of net sales from 2007–2011. *See id.* at 11–12.

First, the figure itself is manufactured from thin air. The documents provided to Ms. Margolis demonstrate that total IVR sales through 2011 are $80 million, and Ms. Margolis did not really deny this. *See* T 69. And overall sales figures, of course, are not damages or claims from dissatisfied customers who sought a refund or cancellation. T 24-25. The parties could not have been expected to rely on $300 million, or even $80 million, as an estimate of damages when settling the case. It simply is not a damages figure at all.

Second, there is not a realistic possibility that sufficient funds would be available to fund a settlement of that size. *See sections* C(2), C(3), *infra.*

The parties and Judge Orlofsky were well aware of the *Margolis* Action at the time of settlement negotiations. Ms. Margolis and her counsel were invited to participate in those negotiations but declined to do so. Friedman Decl., (Docket No. 94), ¶ 17. There is no evidence that the parties did not, and persuasive evidence that they did, consider the IVR claims during the settlement negotiations. For the reasons expressed above in this section, and in the following sections, they reached a responsible settlement of claims, taking into account, *inter alia,* the size of the likely claims and the available resources.

### 2. Whether Defendants Can Withstand a Greater Judgment.

Ms. Margolis cites the *Girsh* factor that asks "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *See Sullivan v. DB Inv., Inc.,* 667 F.3d 273, 323 (3d Cir. 2011), *Girsh, supra.* She argues that the Defendants and related parties, Thomas Shipley and Marketing Architects, possess additional available resources. For the reasons expressed below, I disagree. In any event, it must be remembered that this is not the only *Girsh* factor; against the wealthiest defendant in the world, the fairness of a settlement amount depends on other matters as well, such as the strength of the claims, litigation risk, and so on.

#### a. Defendants' finances

Ms. Margolis first argues that Defendants have not produced sufficient data to establish their own insolvency.

The Defendants have submitted evidence of very significant losses over the last 24–36 months. Opp. at 16. REDACTED

REDACTED

REDACTED *Id.*; Shipley Decl., (Docket No. 123), ¶ 35. REDACTED

REDACTED to

REDACTED *Id.*; Shipley Decl. ¶ 37. REDACTED

REDACTED

REDACTED *Id.*; Shipley Decl. ¶ 38. And REDACTED

REDACTED

REDACTED 45.

REDACTED

REDACTED

Ms. Margolis received copies of all the financial information produced by the Defendants, including audited financial statements and projections. (Docket No. 99 at 2). Ms. Margolis was not satisfied with the records she received, and submits a report from Robert Greenwald, a certified public accountant. Margolis Br. at 3, 15; Greenwald Decl., (Docket 104-2). Greenwald states that the financial data produced by the Defendants are "inadequate to

accept a claim of insolvency." Greenwald Decl. at 3 (stating that he would require more documentation in order to assess the Defendants' insolvency). Faced by documentation, it is always possible to demand more documentation. But neither Greenwald nor Ms. Margolis makes any affirmative claim about the state of the Defendants' finances. More fundamentally, "insolvency" is not a requirement under *Girsh;* a settlement is not to be deemed inadequate because it failed to drive the defendant out of business.

The financial data before the Court are more than adequate to merit my deference to one of the premises of the parties' settlement, which was that it was fruitless to try to wring more money from these Defendants. And of course the Defendants are the parties primarily liable for whatever misconduct occurred.

### b. *Shipley and Marketing Architects*

Ms. Margolis argues, in addition, that Thomas Shipley and Marketing Architects would be potential sources of more money for a settlement fund. Margolis Br. at 16. In her view, the settlement's release of claims against non-parties Shipley and Marketing Architects is inappropriate. *Id.* at 31. Shipley and Marketing Architects were never named as defendants in the *Sabol* Action. Ms. Margolis added them to her amended complaint after she was notified of the *Sabol* mediation and pending settlement.

There is nothing wrong, in general, with releasing non-parties in connection with the settlement of a class action. That is frequently done when the claims against the non-parties are closely related factually to the claims

asserted against the named parties. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (citing *In re Lloyd's Am. Trust Fund Litig.*, No. 96-cv-1262 (RWS), 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 143, 160-165 (E.D.N.Y. 2000); Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 12:16, at 318 (4th ed. 2002)).

Contrary to Ms. Margolis's assertions, and as discussed in more detail at pp. 9, 20–23, *supra,* the claims against Shipley and Marketing Architects in the *Margolis* Action have the same factual basis as the claims against the Defendants in the *Sabol* Action. Ms. Margolis has not provided a persuasive reason for excluding Shipley and Marketing Architects from the release. The desire for finality requires that the settlement include a release of individuals in addition to the corporate Defendants.

Shipley is the CEO of the Defendant companies. Shipley Decl., (Docket No. 123), ¶ 2. Ms. Margolis has not made any showing that he would be personally liable for claims related to the corporate Defendants' practices. T 20 – 21. Shipley is not alleged to have made any representations to the class. There are no veil-piercing allegations or the like. *Id.* He is properly released as a director/officer. *See In re Prudential*, 962 F. Supp. 450, 559 (D.N.J. 1997) (releasing claims against officers, directors, and agents for corporate Defendant).

Ms. Margolis has also failed to show why Marketing Architects should not be released. The release of Marketing Architects serves the goal of finality,

and is not unfair. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d. Cir. 1995) (class actions avoid inconsistent obligations by defendants; citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 402–03, 100 S.Ct. 1202, 1211–12, 63 L.Ed.2d 479 (1980)). The available facts suggest that the parties made a permissible decision that it was not worth holding up a settlement to pursue an additional recovery from Marketing Architects. Marketing Architects served as a consultant for the Defendants, entering into a marketing agreement on or about May 24, 2007, for audio advertising and other services regarding the marketing of Hydroxatone products via the IVR system. T 21; Shipley Decl. ¶ 47, Exh. F (Advertising Agreement). In that agreement, the Defendants warranted that they would approve all advertiser content and that such content would comply with "all applicable laws and regulations." Shipley Decl. ¶ 50, Exh. F. ¶ 5. Defendants therefore had the final say over the IVR scripting. T 58–59. Marketing Architects acted as the agent of the Defendants when it co-produced advertisements and assisted with the set-up of the IVR system. *See Margolis* AC ¶¶ 12–14, 81. And a global settlement cannot be reached without releasing Marketing Architects, which would have a contractual right to be indemnified by Defendants if sued separately. T 57.[6]

There is ample evidence that Ms. Margolis was not herself an IVR purchaser, and would lack standing to pursue the rights of IVR customers

---

[6] The agreement also provided for mutual indemnification. *Id.*, Exh. F ¶ 8; T 21. So even if Ms. Margolis was able to establish liability on the part of Marketing Architects, the company would likely seek indemnification from the Defendants under their Advertising Agreement.

personally or as a class representative. But in any event, it was within the settling parties' reasonable discretion to conclude that potential claims against Marketing Architects lacked sufficient substance to justify jeopardizing the settlement.

Ms. Margolis requested a deposition of Marketing Architects at the Fairness Hearing. T 75, 91. As noted above, after hearing from counsel at the Hearing, and considering the information already available to Ms. Margolis, I agree with the Magistrate Judge that this deposition is not necessary. All of the information about Marketing Architects that was considered by the settling parties was available to Ms. Margolis. Ms. Margolis has a copy of the relevant agreement between Defendants and Marketing Architects. At the Fairness Hearing, Mr. Margolis read into the record excerpts from depositions of Mr. Shipley and Mr. Siegel in which the relationship between Defendants and Marketing Architects was explored. T 65-68.

The materials already provided to the Court and the presentation at the Fairness Hearing provide more than sufficient information to evaluate the fairness of the settlement.

### 3. Whether Additional Insurance Coverage Is Available.

Ms. Margolis also contends that the settlement is inadequate because Class Counsel overlooked an additional $13 million in insurance coverage that is available to satisfy the class members' claims. Margolis Br. at 3.

REDACTED

REDACTED                    *Id.* A representative from Great

American Insurance was present at the mediation. *See* Orlofsky Decl., Docket

No. 122, ¶ 10.                    REDACTED

            REDACTED                    *See* Shipley Decl.

¶ 46.                    REDACTED

        REDACTED            *Id.*

The carriers for all of the other relevant policies held by the Defendants

were placed on notice, and have disclaimed coverage. Opp. to Objection at 17;

*see also* T 39.                    REDACTED

                    REDACTED

                    REDACTED

REDACTED            40. The Defendants did not at first serve notice under

their Directors and Officers ("D&O")[7] policy, known as the "Darwin" policy,

because there was no claim against a director or officer. T 40.

Ms. Margolis's argument that the carriers would potentially reverse their

decisions is speculative at best. There is no evidence that these insurers

disclaimed coverage lightly or inadvisedly. There is no evidence that Plaintiffs

or Defendants had any incentive to forgo available insurance coverage, or that

Defendants failed to investigate it.

_____

[7] In the transcript, "D&O" is sometimes incorrectly rendered as "denote."

31

Ms. Margolis offers John O'Brien as an insurance expert. Margolis Br. at 3–4; O'Brien Report, (Docket 104-1). (Ms. Margolis also requested that the Court consider a supplemental report from O'Brien, a request that I granted.) *See* Docket No. 134; T 75. O'Brien's report echoed Ms. Margolis's position that the *Margolis* action contained claims for disgorgement that were distinct from the refund claims in *Sabol* and not covered in the proposed settlement. (Docket No. 104-1 at 7-8). To cover these claims, O'Brien considered the availability of coverage under policies other than the Great American policy. *Id.* at 16 (stating that these parties are given a "free ride" in the settlement). He also considered, in particular, coverage related to Marketing Architects and Thomas Shipley— the additional defendants named in the *Margolis* action. *Id.* at 8, 10, 14, 17 (examining the AIG "Chartis" and Darwin Director and Officer policies held by ACMG, and the "Beasley Media Policy" held by Marketing Architects). Counsel rested on O'Brien's written submissions, and waived the right to present live testimony from O'Brien. T 75, 90-91.

Setting aside the issue of whether the additional Margolis claims have merit, O'Brien does not really state that the other policies cover these claims. O'Brien states that that it is "more likely than not" that coverage could be obtained under the Darwin policy (*id.* at 17), and that a "strong claim can be made" for coverage under Marketing Architects' Beasley Media Policy (*see id.* at 19, reasoning that the insurer bears the burden of demonstrating an exclusion). In his supplemental report, O'Brien argues that AIG took a "narrow position" regarding the period of coverage and that the parties had not

"meaningfully pursued" the additional coverage. (Docket No. 134-2 at 3, 8). In short, his reports suggest that reimbursement *might be* obtained from these other insurers through negotiation, arbitration, or litigation. *See* Docket Nos. 104-1 at 13–19; 134-2 at 8. There is a certain generic quality to these contentions: an assurance that the insurer has the burden and that, if pressured, might offer money. O'Brien does not speculate as to cost and additional time that would be required by such an effort, or the difficulties presented by pursuing policies held by these non-parties.

Counsel for Defendants pointed out that fighting the insurers would deplete the settlement fund for the sake of a speculative claim and a recovery that would be long delayed, if it came at all:

> extending this case, and extending the cost, and forcing the company to burn through the current insurance policy, which right now we have set aside to cover the settlement fund with the risk, of course, being that the legal fees will burn through that, and at the end of the day, it's completely speculative as to whether there's going to be additional coverage or not.

¶ 41. While *Girsh* requires an evaluation of whether Defendants could withstand a greater judgment, it does not demand that significant resources be spent in separate litigation to unearth other sources of recovery. *See Girsh*, 521 F.2d at 157. The parties' decision to forgo such protracted collateral litigation is understandable.

In the mediation presided over by Judge Orlofsky, the parties considered the availability of insurance coverage. I see no reason to second-guess the

outcome. Orlofsky Decl. ¶ 14. The facts and claims of the *Margolis* Action were well known to Judge Orlofsky and the parties, as was the Defendants' desire to achieve a "global peace" through this settlement. *Id.* ¶ 12. Judge Orlofsky agreed that the settlement was fair in light of all reasonably available insurance coverage, and Ms. Margolis has not introduced any persuasive evidence or arguments to the contrary.

### 4. Whether the ASA's Release of Claims is Overbroad.

Ms. Margolis also argues that the ASA's release of factually related claims is overbroad. *Id.* at 17. The ASA releases "any and all actions ... that in any way challenge Defendants' Risk Free Trials and/or Auto-Shipment Programs, billing practices ..., the representations and/or disclosures and/or Defendants' adherence to the terms ... of such offers, and/or any claim related to the receipt of and/or payment for unordered products." ASA § 14.2. This, says Ms. Margolis, is too broad; the release, in her view, should not encompass the separate allegations of the *Margolis* Action.

Ms. Margolis again attempts to establish that the claims and allegations underlying the *Sabol* Action and the *Margolis* Action are distinct. According to Ms. Margolis, the *Sabol* Action deals with the Defendants' refund and cancellation policies, while the *Margolis* Action deals with the Defendants' IVR marketing scheme. Margolis Br. at 18. As discussed above, this supposedly critical IVR-based predicate did not appear in the *Margolis* Action until *after* the settlement negotiations in the *Sabol* Action had begun. At any rate, as established above, the proffered distinction between the two actions is a false

one. *See* pp. 20 – 23, *supra*. Both complaints are based on Hydroxatone's marketing campaign and "risk-free" trial offer. Opp. at 29; *Margolis* AC ¶¶ 18–23; Sabol SAC ¶¶ 1 -2, 11 - 12. Customers who made their purchases through an IVR system are not excluded from the *Sabol* Action class; they are included, and claims related to those purchases are contemplated and provided for in the ASA. *See* p. 23, *supra*; T 9–10; Orlofsky Decl. ¶ 12; ASA ¶ 3.1.

Further, as the Defendants rightly point out, a release for purposes of a class action settlement may be quite broad. Opp. to Objection at 26. It "may include all claims, including unpleaded claims that arise out of the same conduct alleged in the case." *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 326 (3d Cir. 1998) (citing *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir.), *cert. denied*, 513 U.S. 986, 115 S.Ct. 480, 130 L.Ed.2d 393 (1994); *Sandler Assocs., L.P. v. Bellsouth Corp.*, 818 F.Supp. 695, 704–05 (D. Del. 1993), *aff'd*, 26 F.3d 123 (3d Cir. 1994)). Such broad releases serve judicial economy and prevent relitigation by permitting parties to enter into comprehensive settlements. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 366 (3d Cir. 2001) (citing *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982)). Indeed, a class action judgment may even bar later claims that were not, or could not have been, presented in the first action. *Id.*

Ms. Margolis's IVR based claims are part of the same course of conduct alleged in the Sabol SAC and addressed by the ASA. In the alternative, even if the "factual predicate" of the *Margolis* Action diverged from that of the *Sabol*

Action, the claims would arise from the same conduct and could be released here. *In re Prudential*, 148 F.3d at 326.

### 5. Whether Class Members are Disparately Treated.

Ms. Margolis also argues that the ASA impermissibly gives preferential treatment to class members who requested a refund. Margolis Br. at 20.

The ASA establishes two groups of claimants. ASA §§ 5.3–5.4. Group One consists of class members who submit a claim with a sworn statement on the claim form that they: (1) returned or attempted to return risk-free trial products and/or auto-shipment program products, and (2) paid more than shipping and processing and/or return postage and/or received additional shipments of the product OR cancelled and/or attempted to cancel their auto-shipment memberships but received additional shipments. *Id.* § 5.3. These Group One claimants are eligible to receive their choice of a *pro rata* share of the cash benefit, or additional products. *Id.* Group 2 consists of all other class members: essentially, those who are dissatisfied now, but did not attempt to return the product or cancel their auto-shipment membership. *Id.* 5.4. These claimants are eligible to receive a product benefit but are not eligible for a cash benefit. *Id.*

Ms. Margolis, for example, would likely be a Group One class member, entitled to a cash benefit. She alleged in her original complaint and interrogatory responses that she attempted to return the products for a refund. Opp. at 29–30; Mazzuchetti Decl., Exh. B (Docket No. 121-2) (Ms. Margolis's Response to Defendants' First Set of Interrogatories). Under those facts, Ms.

Margolis would be entitled to cash through the settlement. *Id.*; ASA § 5.3.

Of course it is true that the ASA treats the two groups of claimants differently, but not without reason. And both are compensated: those who attempted to return the product or cancel membership may receive cash or product, while those who did not contemporaneously object are entitled to product only.

Overall, the claims rates and selection of benefits data have indicated general satisfaction with the settlement among Group 2 claimants. The Claims Administrator, Gilardi & Co. LLC, sent 2,555,443 million notices to class members. Fukunaga Decl. (Docket Nos. 94-9, 120). As of the date of the Opposition filing (July 10, 2013), none of the supposedly oppressed Group 2 claimants had objected. Opp. at 30.

By the deadline for submitting claims, 36,005 claims were made. Fukunaga Decl., at 2. Group 2 claimants submitted 39.5% of the total claims. Fukunaga Decl., Exhibit A, (Docket No. 101-1 at 2). The "vast disparity" between the number of class members who received notice and the number of objectors strongly suggests that the settlement is fair. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) (applying *Girsh* factors).

Nothing on the face of the distinction between Group 1 and Group 2 claimants suggests unfairness, and there has been literally no objection from any Group 2 claimant. The parties' agreement is the product of advocacy and negotiation from both sides. Again, I see no reason to dissent from Judge Orlofsky's opinion that the negotiations were hard fought and conducted at

arms-length in good faith. Orlofsky Decl. ¶ 13. Giving deference to the settlement negotiated by the parties, I find that the variable recovery provisions in the ASA should not weigh against final approval of the settlement.

### 6. Whether the Settlement Deters the Deceptive Conduct

Finally, Ms. Margolis objects to the settlement because she claims that it fails to deter deceptive conduct, which is one of the purposes of the New Jersey Consumer Fraud Act, as well as the class action device itself. Margolis Br. at 21-22 (citing *Boyko v. Am. Int'l Group, Inc.*, No. 08-2214 (RBK), 2012 U.S. Dist. LEXIS 59125, at *57 (D.N.J. Apr. 26, 2012) (vacated in part on reconsideration); *Lettenmaeir v. Lube Connection, Inc.*, 162 N.J. 134, 138 (1999); *Gammon v. GC Servs. Ltd. P'ship*, 162 F.R.D. 313, 321 (N.D. Ill. 1995)). Ms. Margolis argues that the ASA does not require disgorgement of ill-gotten gains. *Id.* at 22 (citing *Secs. and Exch. Comm'n v. Teo*, No. 2:04-cv-01815, 2011 U.S. Dist. LEXIS 103413, at *14 (D.N.J. Sept. 12, 2011); *State v. Andrews*, 73 Md. App. 80, 89 (1987)). Rather, the settlement amount is paid by the Defendants' insurer. *Id.* at 23.

Given the state of the Defendants' finances, and the primary goal of compensating the class, I find that an insurance-funded settlement is fair and responsible.

Ms. Margolis objects to the particulars of the prospective relief outlined in the ASA. The ASA, she says, does not bar Defendants from using the terms "risk-free" or "free trial" in advertisements. *Id.* at 24 (citing ASA § 4.1(c)(ii)(2)). In addition, Defendants are not barred from delaying disclosure of all the terms

of their risk-free trial and auto-shipment, so long as they do so before the customer's final acceptance of the offer. *Id.* In particular, Ms. Margolis maintains that this unfairly allows Defendants to collect credit card information before they disclose the terms. *Id.* She relies on a consent order in *FTC v. Willms*, another case, which required such disclosure before payment information is collected. No. 2:11-cv-828 (MJP), (W.D. Wash. Feb. 22, 2012); Margolis Br. at 24.

The *Willms* consent order has no precedential authority here. While it is possible that imposing the *Willms* requirements would ensure better deterrence, final approval of the proposed settlement before me does not hinge on what was negotiated in a different case on different facts. Nor does my standard of review require me to fashion the best possible settlement. In any event, Defendants have discontinued the practice to which Ms. Margolis objects, rendering injunctive relief inappropriate at present. T 23. Should the practice be resumed, Defendants may place themselves at risk of being found to have acted unfairly, but that is a dispute for another day.

To the contrary, the Court will give deference to the proposed settlement agreed to by the parties to this case after careful negotiation and under the guidance of Judge Orlofsky in the mediation.

### III.   Remaining *Girsh* Factors

As noted above, a court considering the fairness of a class action should consider, inter alia, the nine *Girsh* factors:

(1) the complexity, expense and likely duration of the litigation . . .;

(2) the reaction of the class to the settlement . . . ;
(3) the stage of the proceedings and the amount of discovery completed . . . ;
(4) the risks of establishing liability . . . ;
(5) the risks of establishing damages . . . ;
(6) the risks of maintaining the class action through the trial . . . ;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ;
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . ..

*Girsh*, 521 F.2d at 157.

I have discussed at length the particular objections of Ms. Margolis, which chiefly focus on factors 7, 8 and 9. For completeness, I here briefly discuss the rest.

The first factor—the complexity, expense, and likely duration of the litigation—favors settlement. *Id.* Litigation of this case would involve further discovery, including extensive inquiry into the Defendants' business practices and depositions of expert witnesses. Plaintiffs' Memorandum in Support of Motion for Final Approval of the Proposed Amended Settlement ("Plaintiffs' Final Approval Br."), (Docket No. 92), at 19; T 6. Even if Plaintiffs were successful at trial, the Defendants would likely appeal, prolonging the litigation further.

The second factor, the reaction of the class, also favors settlement. *Girsh,* 521 F.2d at 157. Out of nearly 2.6 million class members, only a handful have objected to the settlement, and over 36,000 claims have been made. *See* pp. 14 – 15, 37 *infra*; Fukunaga Decl. at 2; T 7. Ms. Margolis made the only substantive objection to the proposed settlement, which has been thoroughly

analyzed for its merits. Overall, the reaction to the class weighs heavily in favor of approving the settlement.

The third factor, the stage of proceedings and discovery completed, "captures the degree of case development that class counsel has accomplished prior to settlement." *In re Gen. Motors*, 55 F.3d at 813. Access to evidence, whether from this case or others, also bears on this factor. *See id.*; *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979); *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1386 (S.D.N.Y.1972), *rev'd on other grounds*, 495 F.2d 448 (2d Cir.1974); *In re Baldwin–United Corp.*, 105 F.R.D. at 483.

Here, the parties conducted adequate discovery. By the time the settlement was reached, interrogatories and document requests had been served. Plaintiffs' Final Approval Br. at 17; Friedman Decl., (Docket No. 94), ¶10. Defendants initially produced approximately 62,000 documents which were reviewed by Class Counsel. Friedman Decl. ¶ 11. During the course of mediation and settlement negotiations, Defendants provided additional discovery regarding sales, customer data, financial status, record-keeping, and insurance coverage. *Id.* ¶¶ 12, 16. With the benefit of this discovery, the parties participated in mediation and arms-length settlement negotiations. *See id.* ¶¶ 16 – 25; Orlofsky Decl. ¶ 13. The parties and the mediator, Judge Orlofsky, were aware of the parallel *Margolis* Action at the time of the mediation. Orlofsky Decl. ¶ 12. Ms. Margolis further provided some of the discovery from her case, including the deposition transcripts of Mr. Shipley and Mr. Siegel, in support of her objection. (Docket Nos. 104-21, 104-22). Aside from certain confidential

settlement memos, the parties shared with Ms. Margolis the same information they exchanged amongst themselves in connection with the settlement process. (Docket No. 96, Exh. 10; Docket No. 99 at 2). In sum, the available information and the parties' familiarity with the facts of the case weigh in favor of final approval of the settlement.

The fourth factor requires consideration of the "risks of establishing liability." *Girsh*, 521 F.2d at 157. This factor also weighs in favor of settlement. Plaintiffs have alleged claims under the New Jersey Consumer Fraud Act ("NJCFA"), and for breach of contract and unjust enrichment. Plaintiffs' Final Approval Br. at 19. The Defendants previously set forth legitimate arguments for dismissal, including the lack of a sufficient allegation that individual plaintiffs had suffered ascertainable harm. *Id.*; *see also* Def. Memorandum of Law in Support of the Motion to Dismiss the First Amended Complaint ("Def. MTD Br.") (Docket No. 33) (administratively terminated). If the settlement were not approved, Defendants could be expected to reassert these arguments. Furthermore, although the Plaintiffs believe they can establish liability at trial, there are inherent risks in litigating consumer fraud claims on behalf of the Class. *See* Plaintiffs' Final Approval Br. at 19–20. For example, the Plaintiffs would need to show that class members attempted to properly return their products and/or cancel future shipments, and that the Defendants had a pattern and practice of denying proper returns. *Id.* at 19–20. The risks of establishing liability weigh in favor of approving the settlement.

Relatedly, the fifth factor, the risk of proving damages, also weighs in

favor of final approval. The presentation of damages testimony in this case would present substantial challenges. *Id.* at 21. As the Defendants argued in their Motion to Dismiss, under the NJCFA a plaintiff must establish an ascertainable loss of money or property as a result of the unlawful conduct. Def. MTD Br. at 23 (citing N.J.S.A. § 56:8-19; *DeHart v. U.S. Bank*, N.A., 811 F. Supp. 2d 1038, 1049-50 (D.N.J. 2011)); *Barrows v. Chase Manhattan Mort. Corp.*, 465 F. Supp. 347, 360 – 61 (D.N.J. 2006). Therefore, the Plaintiffs would need to prove that the Class consumers suffered economic harm as a result of being unable to return their products or cancel shipments. Proving (or disproving) these damages would most likely require dueling expert testimony, some of it specific to each individual Plaintiff. Plaintiffs would bear the risk of failing to convince the jury of their position. Plaintiffs' Final Approval Br. at 21–22.

Finally, *Girsh* also requires consideration of the risks of maintaining the class action throughout the litigation. 521 F.2d at 157. Class counsel believes that this case is suitable for class certification in the settlement context, and as explained in my accompanying Order, I agree. Plaintiffs' Final Approval Br. at 22. Maintenance of a class action throughout a contested litigation, however, is a different matter. *See* Fed. R. Civ. P. 23(a); *In re Cendant Corp Litig.*, 264 F.3d 201, 239 (3d Cir. 2001). The Plaintiffs point out that choice of law issues pose one serious threat to class certification here. Plaintiffs' Final Approval Br. at 22 (citing *Maniscalco v. Brother Int'l Corp.*, 709 F.3d 202, 208–09 (3d Cir. 2013) (upholding district court's finding that South Carolina, not New Jersey, had

most significant relationship to South Carolina consumer's claims)); T 15. The Plaintiffs purport to represent a nationwide Class; I agree that choice of law might require at least the maintenance of subclasses, and might pose some significant additional impediment to an economical resolution of this dispute as a class action.

In addition, in a contested certification proceeding, there might have been difficulty in establishing injury and/or damages on a class-wide basis. Certification is a difficult process, and perhaps is growing more so. *See, e.g., Comcast Corp. v. Behrend,* 569 U.S. ---, 133 S. Ct. 1426 (2013) (discussing predominance under Rule 23(b)(3)). Claimants here had different experiences: Some perhaps felt they were inveigled by a telephone sales representative, others may complain of the automated IVR ordering system, others may have unsuccessfully sought refunds, others may have tried to cancel the automatic shipment program, and others may simply have been dissatisfied with the skin care product itself. If class certification were litigated, such differences would fracture the claims, and would at least add to the complexity and length of litigation. The settlement, however, minimizes such disparities,[8] and grants cash awards and/or additional product, essentially based on a claimant's statement of dissatisfaction with the product or the purchase process.

In total, the *Girsh* factors weigh significantly in favor of final approval of the ASA. For these and the reasons discussed throughout the Opinion, I will grant final approval to the proposed settlement.

---

[8] Claimants are divided into two groups, as explained above.

## IV. Conclusion

For the foregoing reasons, Ms. Margolis's Objection is hereby **OVERRULED**. Final approval for the settlement agreement, as reflected in the accompanying Order, is **GRANTED.**

Dated:  November 22, 2013

_Kevin McNulty_

**Hon. Kevin McNulty**
**United States District Judge**
